PROGRESS DEVELOPMENT CORPO-
RATION, a corporation, and Modern
Community Developers, Inc., a corpora-
tion, Plaintiffs,

v.

James C. MITCHELL et al., Defendants.

No. 59 C 2050.

United States District Court
N. D. Illinois, E. D.

March 4, 1960.

W. Willard Wirtz, Newton N. Minow, John W. Hunt, Richard G. Kahn and Howard Hoosin, Chicago, Ill., Stevenson, Rifkind and Wirtz, Chicago, Ill., of counsel, for plaintiffs.

William R. Englehardt and Allyn J. Franke, of Norman, Engelhardt & Zimmerman, Chicago, Ill., Gerald C. Snyder and Lewis D. Clarke, of Snyder, Clarke, Dalziel, Holmquist & Johnson, Waukegan, Ill., Thomas A. Matthews, Byron S. Matthews, John B. Moser, George B. Christensen, Harold A. Smith and Douglas C. Moir, of Winston, Strawn, Smith & Patterson, Edward J. Kelly, Chicago, Ill., for defendants.

PERRY, District Judge.

In this proceeding, plaintiffs complain that the defendant officials of the Village of Deerfield and of the Deerfield Park District, acting under color of law and using their offices as a cloak, have conspired with the other named defendants and have violated the civil rights of the plaintiffs contrary to the provisions of the Fourteenth Amendment to the Constitution of the United States and contrary to the provisions of Title 42, Sections 1981, 1982, 1983, 1985 and 1988 of the U.S.C.A. They bring their action pursuant to 28 U.S.C. § 1331.

The section of the Fourteenth Amendment relied upon provides as follows:

"Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without the due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The statutes relied upon provide as follows:

"§ 1981. Equal rights under the law

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. R.S. § 1977."

"§ 1982. Property rights of citizens

"All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property. R.S. § 1978."

"§ 1983. Civil Action for deprivation of rights

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. R.S. § 1979."

"§ 1985. Conspiracy to interfere with civil rights—Preventing officer from performing duties

\* \* \* \* \* \*

"(3) If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators. R.S. § 1980."

"§ 1988. Proceedings in vindication of civil rights

"The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of this chapter and Title 18, for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as

modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty."

The verified complaint, as amended, is divided into three counts. Count I names as defendants the Deerfield Park District and the individuals constituting the Board of the Deerfield Park District, namely, James C. Mitchell, President, and Dudley L. Dewey, Edward J. Walchli, Donald W. Keller, and Aksel Petersen, members thereof, and seeks a temporary injunction *pendente lite* with the prayer that such injunction be made permanent upon final hearing. (See para. 39 of summarization of allegations of complaint, *post.*)

Count II names as defendants the Village of Deerfield and the individuals constituting the Board of Trustees of said Village, namely, Joseph Koss, President, and Winston Porter, Harold L. Peterson, John Aberson, Maurice Petesch, and Arno Wehle, members thereof, and seeks a temporary injunction *pendente lite* with the prayer that such injunction be made permanent upon final hearing. (See para. 40 of summarization of allegations of complaint, *post.*)

Count III, a conspiracy count, names all of the foregoing as defendants (except the Deerfield Park District and the Village of Deerfield) and, in addition thereto, ten other individual defendants, namely, Joseph G. Powell, Andrew G. Bradt, Harold C. Lewis, Herbert H. Garbrecht, Hal A. Petit, Robert D. Rierson, Robert G. Mullen, Leonard Bronstein, David J. Maundrell and Frank M. Blake. Plaintiffs seek damages in the sum of $750,000.

The plaintiffs having served notice upon counsel for the individual defendants named in Counts I and II, moved the court for a restraining order against the defendants named in each of those counts and for a hearing date upon a motion for a preliminary injunction in each instance. Deerfield Park District and the Village of Deerfield were not then parties defendant and so were not served. Counsel for the individual defendants appeared but no testimony was heard. The court heard oral argument, considered the verified complaint and thereupon denied the motion for a restraining order against the individual defendants, who are described as President and members of the Deerfield Park District, upon the allegations of Count I.

The court, however, granted plaintiffs' motion for a restraining order against the President and members of the Board of Trustees of the Village, in their individual capacities, upon the allegations of Count II. The court fixed bond for $1,000 which the plaintiffs made and which was approved. Thereupon the court entered a restraining order upon the allegations of Count II, enjoining said individual defendants from enforcing the building code of the Village of Deerfield in any discriminatory, arbitrary or capricious manner against plaintiffs until further order of court, specifically providing, however, that the defendants were in no way restrained from lawfully enforcing said building code, all of which is more fully set forth in the order of this court entered on December 22, 1959.

The court fixed December 29, 1959, as the date for hearings. They were not completed on that date and the restraining order was continued in force until January 6, 1960, on which date said order expired by its own limitation. The court was without jurisdiction to extend such order again. Without further order of court, the parties proceeded to present evidence until hearings were completed on January 28, 1960, although final arguments were not completed until February 4, 1960.

On January 28, 1960, the court orally announced that no motion for a pre-

liminary injunction would be granted upon the allegations set forth in Count II and the proof that had been adduced before the court at that time. The cause was taken and has been retained under advisement.

Immediately thereafter, the court began taking evidence upon the allegations of Count I, and on January 28, 1960, concluded evidence thereon although final argument was not concluded until February 4, 1960, upon which date the court took its decision thereon under advisement and has so retained it until this time.

The defendants named in Count II filed a motion to dissolve the restraining order originally entered. The court heard argument thereon and orally announced an intention to deny the motion but retained it under advisement. Since that time, the court, still retaining the matter under advisement, has heard evidence thereon which has caused it to reconsider its orally announced intention to deny the motion. Among other things, it was brought out that plaintiff was in violation of the Deerfield Building Code when this suit was filed and therefore did not come into court with clean hands.

The defendants named in Count II also filed a motion for a summary judgment and that motion was taken with the case.

All defendants joined in various motions to dismiss the whole complaint, including Count III. The motions were supported by affidavits under oath. Plaintiffs' counsel stated in open court that one of the motions and affidavits did not completely speak the truth. The court thereupon gave leave to plaintiffs to answer the motions and to file counter-affidavits but the plaintiffs failed to file any answer to said motions or any counter-affidavits or response thereto whatsoever.

At the conclusion of evidence upon Counts I and II, the court heard testimony from plaintiffs and defendants upon the said motions to dismiss Count III and the complaint as a whole. Those motions were taken under advisement.

It became apparent to the court at the outset of these proceedings that while the three counts of the complaint, in effect, set forth three suits, much time and effort would be saved if all the parties named in each of the counts were present at all hearings—with full right of cross-examination of all the parties—and if the evidence taken on the hearing of each motion was included in the consideration of every other motion.

It was so ordered and accordingly the hearings proceeded without objections from any of the parties at any time during or since the hearings were concluded.

For purposes of brevity, plaintiff Progress Development Corporation will hereinafter be referred to as "Progress"; plaintiff Modern Community Developers, Inc., as "Modern"; defendant Deerfield Park District as "Park District"; defendant Village of Deerfield as "Village"; Board of Deerfield Park District as "Park Board"; Board of Trustees of the Village of Deerfield as "Village Board".

Inasmuch as it was solely on the verified complaint herein, and without the taking of evidence, that the court granted plaintiffs' motion for a restraining order (on the allegations of Count II) and denied plaintiffs' similar motion (on the allegations of Count I), a summarization of the allegations of that complaint appears appropriate at this point:

1. Progress is an Illinois corporation duly organized to purchase and subdivide land, construct residences thereon and to sell the same in the ordinary course of business.

2. In April, 1959, and at subsequent dates, Progress entered into purchase agreements for two tracts of vacant land, suitable for subdivision and located in Deerfield, Lake County, Illinois.

3. Thereafter it surveyed, platted and subdivided said vacant tracts of land into two subdivisions—one known as Floral Park Subdivision (containing

about 15 acres) and the other known as Weinrib's Pear Tree Subdivision (containing about 7 acres).

4. On July 8, 1959, the plat of the Floral Park Subdivision was approved by the Village Board, which is the governing authority of Deerfield, and on July 31, 1959, it was recorded with the Recorder of Deeds for Lake County, Illinois. The plat provides for 39 lots for residences.

5. On September 16, 1959, the plat for Weinrib's Pear Tree Subdivision was approved by the Village Board and on September 18, 1959, it was recorded with the Recorder of Deeds for Lake County, Illinois. That plat provides for 12 lots for residences.

6. Progress, relying upon the Village Board's approval of the plat for the Floral Park Subdivision, employed a licensed engineer to prepare plans and specifications for underground water and sewer improvements and street improvements in that subdivision. These plans having been presented to and approved by the Village Board, Progress spent $30,000 in making the improvements and further obligated itself on an $80,000 surety improvement bond, likewise approved by the Village Board.

7. Progress has likewise obligated itself upon a $26,000 surety improvement bond for improvements in Weinrib's Pear Tree Subdivision, which bond was also approved by the Village Board.

8. On September 21 and 22, 1959, Progress presented to Deerfield's Building Commissioner plans and specifications for the construction of two model homes to be constructed and located at 911 and 921 Wilmot Road in Deerfield. Both sets of plans were approved by Deerfield officials, building permits were issued and Progress had the foundations laid, outside framework and roofs constructed, and other work in progress prior to November 11, 1959. The value of the two houses will be $30,000 for each one when completed.

9. Progress has contractually obligated itself for additional large sums of money for engineers, architects, contractors, materialmen, legal and other expenses.

10. The present fair market value of the Floral Park and Pear Tree land is in excess of $250,000.

11. Modern is a corporation organized and doing business in the State of New Jersey and its principal purpose is investments by purchase of shares of stock in such corporations as Progress which are engaged in the acquisition and development of residential subdivisions and in the construction and sale of residential housing therein. Modern owns shares in such corporations in the States of Connecticut, Delaware, Illinois, New Jersey, New York and Pennsylvania.

12. Modern owns one hundred per cent of the stock of Progress.

13. Both Modern and Progress have adopted and are following a policy of building homes that are available for purchase by Negroes and members of other minority groups as well as by persons who are members of the Caucasian race. Until November 11, 1959, this policy was not known to anyone in Deerfield.

14. There are no Negroes residing in Deerfield.

15. At all times prior to November 11, 1959, Progress had conformed to all of Deerfield's building code requirements and had likewise conformed to all of such building code requirements to the date of the filing of this complaint. It has acted in good faith and was not then and has not since then been in violation of any of Deerfield's building code requirements.

16. Immediately after November 11, 1959, when it became known to the defendants that Progress had a policy of and planned to sell to Negroes some of the houses it proposed to build, the defendant Village and the defendants described as the President and members of the Village Board began a course of harassment of Progress. Even though immediately prior to November 11, 1959, Deerfield officials had inspected

and approved its construction work, those defendants caused their agents and employees to post "stop orders" upon both buildings under construction. It was impossible to comply with those "stop orders". The employees and agents of Progress were ordered off the job and all work was stopped, not only upon the buildings but also on the street and other improvements about which there had been no complaint. There were in fact no building code violations by the plaintiffs and they were given no opportunity to correct violations alleged to exist by the "stop orders". It was several days before the officers and agents of Progress could talk with any of the defendants about correcting the alleged violations.

17. All of the aforesaid conduct was but a part of a scheme between the above named defendants and certain other defendants to impede, delay, harass and stop plaintiffs from constructing and selling houses to Negroes.

18. All of the aforesaid defendants and all of the other defendants named in the complaint had numerous conferences between themselves and others and held numerous meetings at which they conspired to devise a plan to injure the plaintiffs and to deprive them of their rights.

19. During the period between November 11, 1959 and November 17, 1959, the above named defendants and the members of the Park Board and certain other defendants conspired and confederated together for a plan to be presented to the Park Board on November 17, 1959, which plan had as its purpose injury to plaintiffs as set forth in the complaint. The Park District covers an area approximately co-terminous with that of the Village.

20. There was in existence in Deerfield an organization known as the "Deerfield Citizens Committee" of which defendant Joseph G. Powell is President. A sub-committee of that Committee is known as the "Village Caucus Advisory Committee" and its chairman is defendant Andrew G. Bradt.

21. Some time during this period there was formed an organization known as the "North Shore Residents' Association." The exact time of its organization is unknown but its officers became known on November 24, 1959, and the same individuals, together with many others whose names are unknown to the plaintiffs, were active in the unlawful conspiracy against the plaintiffs at all times after November 11, 1959. Defendant Harold C. Lewis is a member of and chairman of the "North Shore Residents' Association"; defendant Herbert H. Garbrecht is a member of and vice-chairman of said group, and defendants Hal A. Petit, Robert D. Rierson, Robert G. Mullen, Leonard Bronstein, David J. Maundrell and Frank M. Blake are members and directors of the "Residents' Association". At a meeting held on November 18, 1959, and at all other public meetings thereafter, defendant Harold C. Lewis and various other persons announced that a plan would be devised to prevent Progress Development Corporation from completing its project of constructing and selling houses to Negroes.

22. At a meeting of the Park Board held on November 17, 1959, certain of these defendants requested the Board to take steps to acquire, for park purposes, the two subdivisions owned by Progress. During the course of the meeting, defendant Joseph G. Powell announced that he would contact certain civic groups to make a study of the needs of the Park District. Prior to this Park Board meeting, defendant Harold C. Lewis and others had already planned to conduct a poll in Deerfield to determine the public sentiment in Deerfield for or against plaintiffs' plan to build and sell houses without restricting sales to persons of the Caucasian race. All of the defendants were fully aware that the poll was to be taken on December 6, 1959. The defendants who are President and members of the Park Board then adjourned the meeting of November 17, 1959 to December 7, 1959 for the purported purpose of studying the reports that would then be made by civic groups

upon park needs, but actually for the purpose of aiding the conspiracy by giving time for the defendants to take the aforesaid poll and to further arouse opposition to the plaintiffs in Deerfield.

23. Immediately thereafter the defendants who are the President and Trustees of the Village met, namely, on November 18, 1959, and again on November 23 and 24, 1959. The public was invited. The meetings were noisy and disorderly and the lawful plan of plaintiffs to sell some of its houses to Negroes was denounced as "totalitarian", and a "forcing" of Negroes and other non-Caucasians upon the Village. Many inflammatory statements were made at the meetings. Other public meetings were held at the American Legion Hall at which the same speeches were made by defendant Harold C. Lewis and other defendants and by other persons whose names are unknown to plaintiffs.

24. Numerous secret meetings were held in private homes by the defendants and a purported report and recommendation of park needs was prepared which was solely for the purpose of giving an air of legitimacy and color of law to any action the Park Board might take to acquire the property of Progress by condemnation proceedings. The said purported report was a six-page document labelled a "comprehensive study," and covered such broad subjects as "Relationships Between Governmental Bodies," "Village Objectives," "Traffic and Parking," "Zoning," "Water and Sewers," "Expansion of Village Boundaries," "School Objectives," "School Consolidation," "School Facilities," "Park Objectives," "Park-School Site Program," "Major Park-Sites," "Park District Boundaries," and "Recommendations." There was in fact no such study made. The so-called report included other sites strategically situated throughout Deerfield and recommended the acquisition of these sites, as well as the property owned by Progress. A further purpose of said purported "Report" and "Recommendation" was for the purpose of influencing public support of any program that the Park Board might undertake.

25. At their meeting of November 17, 1959, the defendant members of the Park Board were informed that defendant Harold C. Lewis and others intended to conduct a poll of the Village on or about December 6, 1959. The meeting was adjourned to December 7, 1959. The true purpose of that adjournment was to await the outcome of such poll. When the President and members of the Park Board met on December 7, 1959, they adopted resolutions designating Floral Park and Weinrib's Pear Tree Subdivisions as park sites and ordered that those subdivisions be acquired by condemnation proceedings for park purposes. (An exhibit attached to the Complaint mentions an offer made to the plaintiffs, on direction of the Park Board, of $166,199.91.) Resolutions adopted by the Park Board at that meeting also provided for a referendum to be held for the purpose of submitting to the voters a $550,000 bond issue, $175,000 of which the resolution earmarked for the purchase of the two subdivisions belonging to Progress. The referendum date was set for December 21, 1959, the earliest possible date that would be within the statutory requirement of the State of Illinois.

26. Offers to purchase, totalling $166,999.91, were contained in three letters dated December 7, 1959, signed by the Secretary of the Park Board and addressed to Progress and to the Chicago National Bank, Trustee under Trust No. 16093, legal title holder of certain of the property on which the purchase price had not been fully paid by Progress. These offers were delivered personally by certain of the defendants other than the members of the Park Board. These offers were not made in good faith but were made for the purpose of acquiring the subdivisions in order to prevent Progress from building residential housing thereon and to prevent sales of homes thereon to Negroes and other non-Caucasians.

27. In a letter dated December 10, 1959 (Ex. 2) Progress, through its at-

torney, rejected the $166,999.91 offer of defendant Park District and its Board members on the ground that the sum offered was so inadequate that Progress considered the offer not to have been made in good faith.

28. There is no bona fide public need or necessity for the acquisition of either of the two subdivisions for park purposes or for any other public use or purpose.

29. The acquisition of Floral Park and Pear Tree Subdivisions was never considered by the Park Board until after the meeting of November 17, 1959.

30. The acts of the President and members of the Park Board in seeking to condemn the two subdivisions belonging to Progress were abuses of its powers of eminent domain conferred upon it by the laws of the State of Illinois, to-wit, Ill.Rev.Stats., c. 105, Section 8–1 and Ill. Rev.Stats., c. 47, Sections 1 to 17.

31. Plaintiffs allege that each and every defendant has conspired together and that each is bound by the act of every other defendant. They charge that each and every defendant, because of the alleged conspiracy they have entered into, is guilty of each and every overt act alleged in the complaint. Plaintiffs charge that there have been innumerable other overt acts committed by the named defendants and other defendants and that each and every one of the defendants named in the complaint is guilty of said additional overt acts as co-conspirator.

32. Plaintiffs charge that defendants Park Board, its President James C. Mitchell and Board members, and their employees and agents, did not make available to them the books and records of the Park Board when demanded and that the delay in producing them was part of the conspiracy charged.

33. Plaintiffs charge that all of the acts of conspiracy alleged have required each of them to divert their officers from their duties, and to expend large sums of money in attempting to meet the demands of the various defendants with the result that they have incurred addi-

tional expenses, costs and damages in and about their property and business.

34. Progress alleges it has been damaged by disparagement of its business reputation and has incurred additional construction costs as a result of the unlawful conspiracy and acts of the defendants.

35. Modern alleges it has been damaged in the conduct of its business in the State of Illinois and elsewhere in the United States by disparagement of its business reputation, by impairment of the value of its stock and sales thereof to the public, by delays and difficulties in the construction of residential developments and the sales of houses therein, all caused by the unlawful conspiracy alleged and the acts of the defendants in furtherance of such conspiracy.

36. Plaintiffs charge that they will be irreparably damaged if a preliminary and ultimately a permanent injunction is not granted against the Village of Deerfield and its President, Joseph Koss and the other members of the Board of Trustees enjoining them from enforcing the building code of the Village against Progress for alleged building code violations that do not exist and from enforcing said building code against plaintiffs in an arbitrary and capricious manner and in a different manner than which it is enforced against other builders.

37. Plaintiffs charge that defendants Deerfield Park District and its President, James C. Mitchell, and the other members of the Park Board have threatened to file a condemnation proceeding in the Lake County Circuit Court and that they are in the process of preparing such complaint. Unless restrained they will attempt to acquire plaintiffs' property in Deerfield by condemnation, and that plaintiffs will be irreparably damaged.

38. Plaintiffs charge that the sole and only reason for and the cause of the conspiracy and all of the overt acts and other acts in perpetrating the same is to discriminate against the plaintiffs and is founded upon bias and prejudice against the plaintiffs because of their willingness

to sell houses to Negroes on an integrated basis.

39. Plaintiffs seek a temporary injunction *pendente lite,* which injunction they pray will, upon a hearing be made permanent, forever restraining and enjoining the defendants James C. Mitchell, Park Board President, and Dudley L. Dewey, Edward J. Walchli, Donald W. Keller and Aksel Petersen, Park Board members, their agents, servants, employees, attorneys and each of them, and all persons in active concert and participation with them and each of them from:

A. Attempting to acquire by condemnation or otherwise all or any property now owned by plaintiffs in the Village of Deerfield, Illinois.

B. Interfering, impeding or otherwise attempting to prevent, hinder or delay the lawful construction and sale of houses by plaintiffs in the Village of Deerfield, Illinois.

C. Interfering, impeding or otherwise attempting to prevent, hinder, or delay the lawful conduct of business by plaintiff in the Village of Deerfield, Illinois.

40. Plaintiffs seek a temporary injunction *pendente lite,* which injunction they pray will, upon a hearing be made permanent, forever restraining and enjoining defendants Joseph Koss, Village Board President, and Winston Porter, Harold L. Peterson, John Aberson, Maurice Petesch and Arno Wehle, Village Board members, their agents, servants, employees, attorneys and each of them, and all persons in active concert and participation with them and each of them, from:

A. Discriminating against plaintiffs in the conduct of plaintiffs' lawful business in the Village of Deerfield, Illinois, by unreasonable, arbitrary, and capricious enforcement of the statutes, ordinances, regulations, usages and customs of the State of Illinois and said Village of Deerfield.

B. Interfering, impeding or otherwise attempting to prevent, hinder or delay the lawful construction and sale of houses by plaintiffs in the Village of Deerfield, Illinois.

C. Interfering, impeding or otherwise attempting to prevent, hinder, or delay the lawful conduct of business by plaintiffs in the Village of Deerfield, Illinois.

41. Count III charges all of the defendants with conspiring to discriminate against the plaintiffs and with violating the civil rights of plaintiffs by taking their property to keep them from selling some houses to Negroes. Plaintiffs allege damages in the sum of $750,000. It is a general allegation without specifying the nature and extent of the damages to Modern.

42. Progress alleges the present value of its property to be $250,000. No facts are alleged in support of such valuation, although there is an allegation that Progress has expended $30,000 for improvements. There is an averment that the value of the two houses now under construction will be $60,000 when completed, but no allegation as to how much has been expended in the construction thereof.

No damages are sought from either the Village of Deerfield or the Deerfield Park District.

The complaint states a good cause of action. Certainly the plaintiff, Progress, had a right to sell to Negroes the houses that it proposed to build and had no obligation to shout from the housetops the fact that it planned to do so. Progress had an absolute right to keep that secret within its corporate breast. As a corporation, Progress had no more obligation to divulge its plans than an individual person would have had in a similar situation. Rights guaranteed to "persons" under the Constitution are guaranteed to corporations since the Supreme Court has repeatedly held that corporations come within that classification.

If, as alleged in the complaint, the activities of Progress are limited to unrestricted sales of homes to persons of all races, then Progress could in no wise

be guilty of deceit or bad faith in its dealings with the Village and its citizens when it failed to mention its plan to sell some of the houses to Negroes. As a matter of fact and law, Progress has the absolute right to select its own purchasers. It can select whites only, or Negroes only, or whites and Negroes in any ratio it chooses. It can limit its sales exclusively to Jews, Catholics, Protestants, Orientals, Polynesians, Republicans, Democrats, Socialists, midgets, giants, brown-eyed or blue-eyed people, curly-headed or bald-headed people. It could select only those who are members of the Mafia, K.K.K., N.A.A.C.P., those who are listed in Who's Who or those who are listed in the social register. In short, the law protects Progress in its right to sell to those persons it may choose—and without prior notice thereof to the Village of Deerfield—but the law will not protect, by enforcement, any rights which Progress or anyone else may claim by virtue of recorded or unrecorded covenants which restrict the use or conveyance of real estate in any discriminatory manner whatsoever against any race, color or creed.

It would be lawful for Progress, if it so desired, to require each purchaser of its homes to accept a deed containing a restrictive covenant running with the land and providing that the grantee would never convey the premises to any person not a member of the particular group or classification of persons to which the grantee belonged. Such a deed might also provide for a forfeiture in the event of a breach of the restrictive covenant, and might contain a further provision that any person affected might sue to restrain any conveyance contrary to such covenant and to obtain damages from the offending party. When it came to the acid test, however, such a restrictive covenant would be of no avail to Progress or to anyone else since no court in the United States would or could enforce it. Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161.

Having first ascertained that it has jurisdiction of the subject matter and of the parties to this action brought under the Civil Rights Statutes, and having in mind the limitations imposed upon it by 28 U.S.C. § 2283 that

"A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments,"

and further having considered the verified complaint herein and heard argument of counsel, this court determined that since a good cause of action for a claim for damages was stated under the Civil Rights Statutes, it likewise had equitable jurisdiction for the purpose of protecting and enforcing its jurisdiction at law.

Concerning plaintiffs' motion (based on Count I) for a restraining order enjoining the Park Board officials, individually, from instituting condemnation proceedings to take plaintiffs' property, the court determined that the allegations of Count I did not state a cause that warranted the court's use of its injunctive power without first hearing evidence and argument of counsel on the matter. The court thereupon denied the motion for a restraining order and fixed a subsequent date for hearing evidence and argument upon the prayer for preliminary injunction contained in Count I of the complaint.

The court then turned to a consideration of plaintiffs' motion (based on Count II) for a restraining order enjoining the officials of the Village, individually, from enforcing the building code of Deerfield against plaintiffs in a discriminatory, arbitrary and capricious manner. It appearing to the court that work on the two buildings under construction had been discontinued; that a great deal of emotion and ill feeling existed between the parties; and that a dispute existed between the parties as to whether the agents and employes of Progress had or had not been given the right to correct alleged building code vio-

lations, the court—without finding that the defendants had attempted to or had enforced the Village building code in a discriminatory, arbitrary or capricious manner—granted the motion for a restraining order and fixed a date for a hearing on the prayer for preliminary injunction contained in Count II of the complaint.

There can be no question but what great public concern and interest have been aroused by this litigation and the events leading up to it. Initially, the proceeding seemed to present some perplexing and complex problems but now that all of the evidence is in the matter has resolved itself into a comparatively simple matter both as to facts and as to law. It takes no Sherlock Holmes to unravel and determine the facts and it takes no Oliver Wendell Holmes to comprehend and apply the applicable law.

Plaintiff Progress is an Illinois corporation with its principal place of business in Chicago, Illinois. It has as its principal purposes the acquisition and development of residential subdivisions and the construction and sale of residential housing therein.

Plaintiff Modern is a New Jersey corporation with its principal place of business in Princeton, New Jersey. Its alleged principal purposes are the investment, by purchase of shares of stock and otherwise, in Progress and in other similar corporations which are engaged in the development of residential subdivisions and construction of housing therein. Modern owns all of the issued and outstanding shares of Progress and the façade of local directors is nothing more than a transparent veil, worn solely for adornment. Modern completely dominates Progress.

Defendant Village of Deerfield is a modern, residential, suburban municipality. Its governing body is the Village Board of Trustees, pursuant to the statutes of the State of Illinois. There is also a Village Manager, pursuant to ordinances adopted by said Board. The Village is a rapidly growing community. Its population has increased from 3,288 in 1950 to 4,188 in 1952; to 7,609 in 1957 and in December, 1959, when this suit was instituted, its population was approximately 11,000. As a result, vacant land available for parks has rapidly disappeared. Roughly calculated, the Village is a two-mile-square area. According to accepted municipal planning, such a community should have at least 250 acres of park. At the present time Deerfield has only about 47 acres and it is obviously in need of a diversified park system with parks scattered throughout the community. There is practically no vacant land left which is available for parks except that which is owned by the plaintiffs and the other parcels which were included in the referendum held under the direction of the Park Board for the purpose of acquiring plaintiffs' land and the other parcels for the school-park program.

The need for more land for parks has been well known to the Park Board and on two separate occasions in 1959 referendums were held in an attempt to obtain additional land. On each occasion they were unsuccessful. Opposition came from a fear of increased taxes and because of a disagreement as to where the parks should be located. Some citizens wanted one large park at the southeast part of the Village and others wanted smaller parks distributed throughout the community.

The defendant Joseph Koss is now and at all times mentioned in the complaint has been the acting President of the Board of Trustees of the said Village, having been appointed to said office by the other members of the Board of Trustees to fill a temporary vacancy in said office. The defendants Winston Porter, Harold L. Peterson, John Aberson, Maurice Petesch and Arno Wehle are now and at all times mentioned in said complaint have been members of the Board of Trustees of said Village.

Deerfield Park District of Lake County, Illinois, is a body corporate and politic under the provisions of Section 8–1 of Chapter 105 of Illinois Revised Statutes, and is governed by a board of:

five elected Commissioners—defendants James C. Mitchell, President, and Dudley L. Dewey, Edward J. Walchli, Donald W. Keller and Aksel Petersen, members, who serve without compensation. They constitute the corporate authority of such district as provided by Section 4–1 of said Chapter 105. Said Commissioners act as legislators and are given legislative powers in said Chapter 105 to enact all necessary rules, resolutions and ordinances and to exercise the power of eminent domain to acquire real estate for park purposes.

The Deerfield Park District covers an area approximately co-terminous with that of said Village, and the land owned by Progress, known as Floral Park and Pear Tree Subdivisions, is situated within said Village and within said Park District.

The other defendants are divided into two groups: (1) Defendants Harold C. Lewis, Herbert H. Garbrecht, Hal A. Petit, Robert D. Rierson, Robert G. Mullen, Leonard Bronstein, David J. Maundrell and Frank M. Blake are members of the North Shore Residents' Association; (2) Defendants Joseph G. Powell and Andrew G. Bradt are members of the Deerfield Citizens Committee.

The North Shore Residents' Association was organized shortly after November 23, 1959, and was opposed to the project being sponsored by Progress and to the actions of the representatives of that company. There is no evidence that the members of the Residents' Association did anything which was illegal. All actions taken by the Residents' Association were separate and distinct from the actions taken by the Park Commisioners. All evidence in the record shows that the Park Commissioners refused to become associated in any way with the Residents' Association and maintained the constant position—which they had adopted many months prior to any knowledge of the proposed activities of Progress—that they were not interested in single properties but only in an over-all land acquisition program for all of the Village.

The Deerfield Citizens Commission is a not-for-profit Illinois corporation which was organized in 1950 with the purpose of "Full cooperation with all village governing bodies for a better Deerfield," and it has been the main organization in Deerfield working on all civic problems. On many occasions in the past, this Committee advised the Park Board and actively campaigned in Park District, School District and other civic elections in Deerfield. These activities have been continuous from 1950 to December 21, 1959. This Committee is composed of civic-minded persons interested only in the welfare of the children and other residents and taxpayers of Deerfield.

There is no credible proof of any combination or conspiracy whatsoever between the defendants, members of the Board of Trustees and Park Commissioners during the period from November 11, 1959 to December 1, 1959. There was no concerted plan or conspiracy between any of the defendants, and in fact, except that certain defendants were acquainted as local citizens, there was no relation between the Park Commissioners and the other defendants during the period from November 11, 1959 to December 21, 1959. The evidence clearly revealed that several of the individual defendants had never personally met or seen a number of the other individual defendants and defendants who were Village officials and the evidence also revealed that the Village officials did not know all of the individual defendants until they appeared in court. As a matter of fact, several of the defendants were introduced to each other in court.

The record discloses that the Park Commissioners have served faithfully and industriously for the benefit of the taxpayers of Deerfield and have carried on a commendable park-school cooperation plan which has benefited the children and all residents and taxpayers of Deerfield. It is the duty of these Park Commissioners to acquire land suitably located for parks and to expand the usable acres of park land. Both Pear Tree and Floral Park are suitably located for prop-

er park purposes. It is also the duty of the Park Board to acquire land before loss by subdividing or other use makes the land too expensive to acquire.

Deerfield Park District and School Districts 109 and 110 have cooperated for a number of years in a program whereby the Park District purchases land adjacent to the schools and the park land is used both as recreation areas for parks and as recreation and physical education areas for the schools with the result that there has been a saving of taxes and the school districts are able to use their limited funds for buildings. This program has permitted School District No. 110 to build schools which it could not otherwise have built.

Wilmot School of School District No. 110 is located on the southeast corner of Wilmot Road and Deerfield Road and has no vacant land adjacent thereto on the south or east sides. It has approximately 4½ acres of vacant land available for playground which is presently owned by the Deerfield Park District and will have an enrollment of over 1,000 students, many being Junior High students. The only vacant land within the Deerfield Park District adjacent to this school is Floral Park which is immediately to the north across Deerfield Road and comprises approximately 15 acres.

The history of the Park Commissioners' interest in acquiring Floral Park and Pear Tree is of long standing. A qualified park planner was hired by the Park Board in May, 1959. He made a study and viewed the properties now known as Floral Park Subdivision and Pear Tree Subdivision. He prepared a map for the Park Board which shows Floral Park as a proposed park site. At the meeting of the Park Board on May 19, 1959, he recommended the acquisition of the property. He filed with the Board a written report which recommended a swimming pool site be located "in the vicinity of or west of Wilmot Road. Any future pool would relieve the presently proposed pool and draw from the population west of the tracks." At that time the Board determined not

to include the Floral Park site in the August, 1959 referendum and decided to hold it for a future referendum because the Floral Park site is in School District No. 110, with only about one-third of the Park District voters, and there are fewer park sites in School District No. 109 which has about two-thirds of the voters in the Park District.

In May or June of 1959, defendant Mitchell of the Park Board appeared at the School Board meeting of School District No. 110 and the President of the School Board requested the Park District to purchase Floral Park as an additional park site. Mitchell agreed that it should be included in a later Park Board referendum when it appeared that voter approval might be favorable thereto. The referendum of December 21, 1959, carried into effect the plan for park acquisition made in May, 1959—six months before Progress had disclosed its intended operation. The referendum of December 21, 1959, was a furtherance of the commendable park-school cooperation which had been carried on for years in an attempt to provide proper park and school ground facilities for Deerfield.

In December, 1959, only two vacant pieces of property within the Park District—that is, Floral Park and Pear Tree—met the recommendations of the park planner's May, 1959 report that the western pool site be located "in the vicinity of Wilmot Road." The expert advised the Park Board against locating a swimming pool on a park being used in conjunction with a school. Floral Park was, therefore, not suitable for a swimming pool site and Pear Tree was the only vacant property suitably located in the Park District for a western swimming pool site.

At its adjourned meeting on December 7, 1959, the Park Board in open meeting duly passed a resolution calling an election on December 21, 1959, to submit to the voters the proposition to issue $550,000 of park bonds to secure funds to purchase and improve additional park sites. In addition, the Board duly adopted plans and estimates whereby six

sites, comprising approximately 80 acres would be purchased, including Floral Park and Pear Tree. The Park Board authorized the sending of offers to the title holders of Floral Park and Pear Tree and the institution of condemnation proceedings in the event the offers were refused. The cost of acquiring the land would increase by a continuance of the construction.

The Park Commissioners exercised proper judgment in carrying out their duties when they selected these six sites in connection with the referendum of December 21, 1959. The Park District has no funds with which to purchase land except by issuing bonds pursuant to voter approval. The motive and the purpose of the Park Commissioners in passing the referendum resolution on December 7, 1959, was to carry into effect a long-established plan of acquiring proper park lands for Deerfield and the six properties included in the December 21, 1959 election were all proper lands for park purposes. Three of the six sites had been included in elections held in April and August, 1959.

In order to give Progress prompt notice of the offers, defendant Mitchell arranged for personal delivery by certain defendants as well as by registered mail. The voters approved the bond issue on December 21, 1959 and on December 24, 1959, condemnation proceedings were instituted by the Deerfield Park District to secure Floral Park and Pear Tree as park sites, the offers of purchase having been rejected by Progress. The Park Commissioners acted in good faith in exercising their legislative discretion on December 7, 1959 by adopting the resolution calling the election of December 21, 1959.

There is little doubt that had it not been for aroused public opposition to plaintiffs' plan to initiate and maintain a controlled integration plan by selling to Negroes 20 to 22 per cent of the houses it proposed to build, the outcome of the referendum of December 21, 1959 would have been much the same as that of previous referendums held by the Park Board in its attempts to acquire property for park sites. However, although opposition to Progress' plan undoubtedly furnished a major part of the basis for the action of the voters, it was not, as charged, the sole basis.

The undisputed evidence conclusively shows that there is a bona fide public need for the acquisition of both Floral Park and Pear Tree for park purposes. That was clearly brought out by the testimony of the Park Board officials, by plaintiffs' own witness Whitney, and by the park-planning expert, witness Roy Layman.

The motives of the Park Commissioners in adopting the resolution on December 7, 1959, calling the election to secure funds to acquire six park sites, including Pear Tree and Floral Park, were solely and only to provide adequate and necessary parks for Deerfield and were not to interfere in any way with plans of Progress to build homes in Deerfield. There was no motive or purpose on the part of the defendant Park Commissioner-Legislators to interfere with intended use by any owner of his property.

There is no evidence that defendants Joseph G. Powell and Andrew G. Bradt held meetings with other members of the Deerfield Citizens Committee from which there was evolved a plan to demand that the Park District, or other local government agency with the power of eminent domain, acquire Floral Park and Pear Tree by condemnation for the purpose of preventing Progress from putting its sales intention into effect.

There is no evidence that defendant Park Board members combined and conspired with other defendants herein or with any other persons to prevent Progress from constructing and selling homes to Negroes.

There is no evidence that out of any meeting between November 13, 1959 and December 7, 1959 a plan was evolved to demand that the Park District or other local governmental agency with the power of eminent domain under Illinois law, acquire Floral Park and Pear Tree

by condemnation, for the sole purpose of preventing Progress from putting into effect its said sales intention or for the purpose of preventing Progress from exercising its lawful rights.

The Park Board and its representatives cooperated reasonably with the representatives of Progress in making available to the latter the minutes and records of the Park District in conformity with the provisions of the laws of Illinois.

There is no evidence that the offer (described in paragraph 51 of the complaint) which the Park Board made to Progress was not made in good faith.

No member of the Park Board has shown or indicated any hostility or opposition to Negroes as a race or to Negroes owning property in or living in Deerfield.

Plaintiffs have the intention of developing Floral Park and Pear Tree Subdivisions (the premises described in paragraph 11 of the complaint) by building approximately 51 houses thereon. It is their claimed intention to sell 10 or 12 of these houses to Negroes. They will not sell all or even 50 per cent of them to Negroes or all or even 50 per cent of them to Caucasians. This plan the plaintiffs call their "controlled occupancy pattern." On order of this court, plaintiffs produced two forms of restrictive sale agreement by means of which they plan to control future sales for more than ten years, and to preserve the ratio of Negroes and Caucasians they establish. On the trial, plaintiffs were unconvincing in their attempts to avoid the stigma of forcing purchasers to execute such agreements by stating that execution of such agreements would be urged but would not be required. It is clear, and I find, from the admissions of plaintiffs' officers and attorney, and from available literature, that plaintiffs intend to control the ratio of Negroes and Caucasians living on the premises in question for ten years and plan to do it by reserving to Progress or its nominee the right to determine the purchaser of the property when an owner desires to resell.

The plaintiffs were given wide latitude in the production of all proofs possible. All sources of possible conspiracy were minutely examined into by plaintiffs' counsel. No conspiracy, or any semblance of conspiracy by the Park Board Commissioners was proved, and the court finds that no good purpose will be served by requiring defendants Mitchell, Dewey, Walchli, Keller or Petersen to defend further herein and that the Park Board and the individual Park Commissioners, James C. Mitchell, Dudley L. Dewey, Edward J. Walchli, Donald W. Keller and Aksel Petersen should be dismissed from this cause with their costs.

In April, 1959 and at subsequent dates, Progress acquired the two separate tracts of real property (called Floral Park and Pear Tree) which it now owns in said Village. Upon request of Progress, the Board of Trustees of the Village approved plats of subdivision of said property—Floral Park on July 8, 1959, and Pear Tree on September 16, 1959. The plat for Floral Park provides for 39 home sites and the one for Pear Tree provides for 12 home sites.

Prior to the approval of said plats of subdivisions, the Board of Trustees imposed certain conditions upon the plaintiff, Progress, requiring it to reach satisfactory financial arrangements with School District No. 110 which enveloped or bordered upon said property, and the St. Gregory Church which was adjacent to said property. Questions also were raised by the Village relative to the form of subdivision bond which the plaintiff Progress desired to use. The bond form first offered by the builder was not the standard bond form acceptable to the Village and the bond as offered contained clauses and other provisions which did not meet with the approval of Building Commissioner Robert E. Bowen. Apparently these problems were resolved, and a subdivision bond was finally approved by the Village authorities. Other than these conditions and other technical requirements relative to said plats, the said defendants raised no other objections and there was no mention that the

said sites should be or might be set aside for park, school or other public purposes.

The plaintiff builder, having filed the requisite plans and specifications, secured building permits on September 21 and 22, 1959 from Building Commissioner Bowen for the construction of two model homes at the Floral Park subdivision. These homes are now partially completed and are located at 911 and 921 Wilmot Road, respectively. The foundation work on 911 Wilmot Road was completed toward the end of October and the framing or carpentry work was commenced at that site at or about said time. The framing or carpentry work was commenced at 921 Wilmot Road about a week subsequent thereto.

Progress represented to the court that there were in fact no building violations at the time of the filing of the complaint. The overwhelming evidence is to the contrary.

Building Inspector Richard Chilton spent approximately ten full eight-hour days on the building site during the installation of underground improvements, starting approximately in August of 1959. Building Commissioner Bowen and Building Inspector Kilgore also visited the site during said period. When Building Commissioner Bowen inspected the underground improvements, he found certain violations from time to time but Max Weinrib, Executive Vice President of Progress, corrected them promptly upon receiving notice thereof. At one point during the installation of the underground improvements, Bowen considered the issuance of a stop order because the specifications called for two inches of sand in the sanitary sewer and plaintiff builder was not complying with that requirement. Building Commissioner Bowen did not issue a stop order because he was able to make contact with the contractor and, in Mr. Bowen's words, "We got that straightened out real fast."

Two of the Village Inspectors, Mr. Kilgore and Mr. Chilton, inspected the carpentry work at 911 Wilmot Road during the first week in November. They found that the bracing was improperly installed and was not in accordance with the requirements of the Village Building Code. They called this to the attention of the carpentry foreman who was present on the job. It also appeared that the carpentry foreman did not have a set of approved plans on the job. They tried to explain to the foreman that he would have to correct the bracing and when it appeared that the foreman had difficulty in understanding the matter, they suggested to him that he obtain a copy of the Deerfield Building Code. The foreman said that he would get a copy and that if the bracing was incorrect, he would correct it.

The Acting President of the Village, Joseph Koss, first learned on November 10, 1959, of Progress' plans to establish a so-called integrated housing project in the Floral Park and Pear Tree Subdivisions. On the following evening, November 11, 1959, at a regular Board meeting of the Village Trustees, President Koss received further information relative to plaintiff Progress' plans. No discussion of those plans took place during the course of the meeting but after the meeting had adjourned the Trustees met in a conference room at the Village Hall with their Village Manager and the Village Attorney, Thomas E. Matthews. The Board asked the Village Attorney for advice and guidance and he advised the Board to continue to act as they had in the past and no differently. Defendant Joseph Koss testified that prior to talking with the Village Attorney he really had not known what the Board should or should not do in its official capacity but that on directing the question to Attorney Matthews the latter had replied, "You have taken an oath of office." Village Manager Stilphen heard a discussion of some building violation connected with the Floral Park Subdivision, but recalled nothing specific. The Board agreed that the Village Attorney should discuss the entire matter with Commissioner Bowen so that any directions as to the manner of enforcement of the

Building Code against the builder would be clear.

Pursuant to the direction of the Board of Trustees of the Village, through its Village Manager Stilphen, Bowen went to the office of the Village Attorney on November 12 at which time the Village Attorney informed Bowen that the plaintiffs had plans to establish an integrated housing project but that the Board wanted Bowen to enforce the Village ordinances as to plaintiff builder in the same manner as he would against anyone else in the Village, regardless of plaintiff's plans. It does not appear that (other than these instructions from the Village Attorney) Bowen received any instructions from the Village officials relative to the manner of enforcing the Village ordinances against the plaintiff builder.

On November 13, 1959, Bowen and Kilgore inspected the premises at 911 Wilmot Road and found that the diagonal cross-bracing was nailed over the exterior sheathing, that there was improper nailing and that some of the boards were split and were hanging loose. Bowen also found that the carpenters had completely cut through the header for the ceiling joists. All of these items were in violation of the requirements of the Deerfield Building Code. At that point, Bowen asked Kilgore if the latter permitted that type of construction and Kilgore informed Bowen that he had inspected the premises on a prior date and had told the foreman to correct the bracing. It also appeared at said time that the foreman was unable to produce an approved set of plans for the building. In view of these circumstances, Bowen instructed Kilgore to shut down the job at 911 Wilmot Road. A notice to that effect was posted on the premises by Kilgore and the carpentry foreman was requested to contact Weinrib, agent of Progress, and to have the latter get in touch with Building Commissioner Bowen relative to the situation.

Bowen and Kilgore then inspected the building at 921 Wilmot Road and they also observed violations of the Deerfield Building Code and found that there was no approved set of plans present at the site. Although Weinrib was present at the premises later in the day, he made no attempt to contact Bowen until the following Monday, November 16, 1959.

Plaintiffs complained that it was impossible to comply with the violation notice or stop order posted on the premises at 911 Wilmot Road because it required that the violation be corrected the very same day and at the same time the men were not permitted to work. Bowen and Kilgore explained in their testimony that this was their normal practice and that the effect of having the contractor lose a few days' work generally got effective results. This testimony was not contradicted or impeached in any manner. This practice was substantiated by evidence of other and similar actions taken by the Village Building Department prior to and subsequent to November 13 with other builders.

Testimony shows that on the same date on which a stop order was posted at 911 Wilmot Road, to wit, November 13, Bowen and Kilgore inspected other residential housing in the Village. Upon finding a violation of the Building Code at 1111 Montgomery Street in the Village, they posted a stop order at those premises and that notice also required the contractor to correct the violation the same day.

Testimony further shows that on said November 13 Bowen and Kilgore inspected a residential building in the Scatterwood Subdivision in the Village. There they found that a cross-bracing was missing on one of the walls and that there was improper bearing under one of the steel columns in the garage area. Bowen at said time observed to Kilgore that this was similar to the violation they had found on plaintiffs' premises and he ordered Kilgore to post a violation notice on this job also.

When Bowen posted the stop order at 911 Wilmot Road on November 13, he was acting properly on the basis of the instructions and statement of policy as given to him by the Village Attorney on the previous day. The evidence shows

that although the defect in the cross-bracing at 911 Wilmot Road could have been corrected in forty man-hours of work, it was not until several weeks subsequent to the date of the stop order that the corrections were actually made so that the work would be in accord with the requirements of the Building Code.

It further appears that from the time that Bowen was employed as Building Commissioner in the Village of Deerfield, to wit, October, 1958, and through the year 1959, he had issued approximately fourteen stop orders on other buildings in the Village for divers violations of the Building and Zoning Ordinances of the Village, and that his action in issuing the stop order at 911 Wilmot Road on November 13, was not in variance with his general practice or intended to be discriminatory as to the plaintiffs herein.

Bowen issued two other stop orders against the buildings of the plaintiffs herein: One for failure to furnish spot surveys after several requests had been made therefor, and one for a zoning violation which was discovered after said spot surveys were furnished and it appeared that the eaves on the front of the buildings extended over the front building line in violation of the Zoning Ordinance of Deerfield. It further appears that there were numerous other violations of the Village Building Code at both of the buildings of plaintiffs, as more clearly appears from Village Exhibits eight through twenty-one, and that a number of violations still exist. No stop orders or violation notices were ever issued to the plaintiff builder for these additional violations. Bowen testified that because he had heard rumors that he was picking on the plaintiffs and also because of what the Village Attorney had told him on November 12, he was more lenient with the plaintiff builder than he would otherwise have been.

Progress was entitled to appeal from the orders of the Building Commissioner but never pursued that remedy.

The court finds that the actions of the Building Commissioner in issuing the stop orders against the plaintiff builder were authorized by law; that they were not arbitrary or discriminatory, and that said actions were in conformity with the custom and practice in Deerfield and with the Deerfield ordinances relative thereto.

The court further finds that beginning with the time that information came to the Village officials relative to plaintiffs' plans to establish an integrated housing project, said Village officials went to a great deal of care to conduct themselves in a proper manner, and that despite a great deal of public clamor and excitement which existed in the Village at and subsequent to said time, the Village officials made it clear to the Village residents on several occasions that as Village officials they were obligated to observe not only the laws of the Village but also the State and Federal laws as well. The action of the Village officials in turning to the Village Attorney for advice and the course followed by said Village officials was a sound and commendable approach to the problem and appears to have been carefully designed to be neither arbitrary nor discriminatory against the plaintiffs.

Building Inspector Kilgore testified that he was biased against Negroes and did not want any in Deerfield. He stated that he had moved to Deerfield to get away from Negroes who had moved into the community where he had previously resided. He was the inspector who posted the stop orders and had the conversation with the agents and employees of Progress. The court has no doubt that under the circumstances Building Inspector Kilgore displayed ill temper, was arbitrary in manner and exceeded his authority in his conversations with the agents and employees on the job locations when he posted the stop orders and at other times. In his dealings with Building Code violators, a building in-his manners and speech are more apt to be blunt than Chesterfieldian. Where to be ceremonious in his approach and spector, of course, is not likely at best.

discourteous conduct, such as is attributed to Inspector Kilgore, is connected with the performance of official duties, it is no violation of civil rights. If the statements made and conduct are merely rude, they are not actionable in any manner. If the conduct amounts to assault, or the statements amount to slander, they are actionable in the State courts but not as a violation of civil rights. The proof in this case does not even suggest that Kilgore was guilty of any more than rude behavior. This one incident is the only evidence shown by plaintiffs to substantiate its general allegations against defendants in Count II. All else is conjecture, suspicion and statements ascribed to other persons for which the defendants in Count II are not in the slightest way shown to be responsible.

There was then and there is now available to Progress an administrative appeal provided by the ordinances of the Village of Deerfield pursuant to the power vested in that Village by the laws of the State of Illinois. Progress does not even allege in its complaint that it made any attempt to use such remedy at law. In fact, the complaint fails to even mention the existence of such relief and, by general context, implies that no such remedy existed at the time of the filing of the complaint and the amendment thereto. The existence of a remedy at law, coupled with the failure of the plaintiffs to use it, is sufficient for the court to deny the relief sought in Count II.

The plaintiffs failed to introduce any evidence whatsoever of the non-existence of violations of the Deerfield Building Code. All of the evidence presented by the parties established that there were violations for which no correction orders or stop orders had been issued. Plaintiffs offered no facts, law or custom to show that forbearance relative to building code violations in one or more instances deprives a municipality of a right thereafter to enforce its Code, or makes it liable under the Civil Rights Statutes in the event it thereafter chooses to enforce its building code. The plaintiffs did not show any facts, law or custom that enables a person to violate a civil or criminal statute or ordinance and then successfully plead that others are guilty of the same violation, or that the law is being enforced against him in a discriminatory manner. It is the equal protection of the laws that is guaranteed to each person and not equality of punishment or penalty for the violation. In addition, the defendants also established, by numerous photographs and other undisputed testimony, the existence of numerous glaring Building Code violations at the time the stop orders were posted.

The evidence adduced at the hearing on Count II of plaintiffs' complaint completely fails to support plaintiffs' charge that the individual defendants, Winston Porter, Harold L. Peterson, John Aberson, Maurice Petesch, Arno Wehle and Joseph Koss and their agents, servants, employees and attorneys, conspired either among themselves or with the Park Board or other defendants herein or with any other person to discriminate against plaintiffs or to cause discriminatory treatment against plaintiffs, or in any way to deprive plaintiffs of any rights guaranteed to plaintiffs under the Constitution and laws of the United States.

The court further finds from the evidence herein that the actions of the defendants and of the Building Commissioner of Deerfield in the manner of enforcing the Building Code and other ordinances against the plaintiff builder did not materially differ subsequent to the date upon which said defendants learned of plaintiffs' plans to establish integrated housing from the manner of such enforcement prior to the said date. The bulk of the violations appear to have occurred in November and subsequent thereto but this is explained by the fact that these violations appeared in the framing or carpentry work on plaintiffs' buildings and that said framing and carpentry work was not commenced until the last week in October at the building at 911 Wilmot Road and until about a week subsequent thereto at the building at 921 Wilmot Road.

The court further finds that the plaintiff builder was dilatory in correcting violations which were brought to its attention, and that the carpentry foreman did not have with him or take the time to consult the Building Code of Deerfield. In fact, Max Weinrib, who was in charge of the entire building program for the plaintiff builder, did not obtain a copy of the Deerfield Building Code until November 16, 1959 which was several days later than the posting of the first stop order.

The only overt acts which are charged to the Village defendants herein by said complaint and which are well pleaded have to do with the manner of the enforcement of the Building Code and other ordinances of the Village of Deerfield against the said plaintiffs. Other than sweeping and general conclusions of the pleaders, no other specific overt acts are charged against said defendants in said complaint.

A full and complete hearing was had herein on Count II of the complaint, with ample opportunity to plaintiffs to examine and cross-examine the Village officials and employees of the Village, and the plaintiffs have completely failed to establish that any conspiracy existed on the part of said Village officials, either among themselves or with others, to deprive the plaintiffs of rights guaranteed them under the Constitution of the United States.

Although the complaint contains general allegations that the Village officials attended certain public meetings, there is no specific allegation that as a result thereof the said defendants committed any acts which had the effect of or were specifically designed to deprive the plaintiffs of their lawful rights.

The complaint contains no allegations that the Village defendants have exercised any right of condemnation or that they were materially effective in persuading the Deerfield Park District to exercise that right.

Upon the basis of the entire record herein, including the evidence taken under Count I of the complaint, it does not appear that the said Village officials engaged in a conspiracy with each other or with others to deprive plaintiffs of rights contrary to the provisions of the Civil Rights Statutes or of rights guaranteed them under the Constitution of the United States.

After reviewing the entire record and the evidence taken herein on said Counts I and II, there does not appear to remain any issues of fact which require determination by the court or a jury.

The further charge made in the complaint that the Village defendants did not exert reasonable efforts to make clear to Deerfield residents their official obligation and responsibility to enforce local law equally and without fear or favor has been entirely rebutted by the evidence adduced herein. The charge is not supported by any evidence.

The evidence revealed that some four or five years ago a Negro family moved into Deerfield and lived there for two or three years without incident and that when the family moved from the Village it was of its own volition and not because of hostility or discrimination shown it but because the head of the family was prosecuted and heavily fined as the owner of certain Chicago slum property and could no longer afford to live in Deerfield.

It appears from the evidence and the record herein that plaintiffs' plan to establish an integrated housing project in Deerfield, Illinois, carries with it an element whereby plaintiffs seek to effect a system of controlled land tenure on racial and discriminatory bases.

The whole community was thrown into an uproar after November 11, 1959 when it became known to the officials and citizens of Deerfield that some of the houses that plaintiffs proposed to build would be sold to Negroes and other non-Caucasians. The court finds, however, that the ensuing turmoil was not caused solely by the fact that the public had been informed of the proposed sale of houses to Negroes. The court finds that imme-

706

diately after the revelation of that news, the residents of Deerfield were bombarded with telephoned offers to purchase their homes at prices ranging from 50 to 75 per cent of their actual cost or fair market value. There is no credible evidence of the identity of the persons responsible for those calls. The only finding the court can and does make relative thereto is that it was a quickly organized campaign carried on by persons, highly skilled in the procedure, who practice it in various areas in and around Chicago where white and colored communities adjoin each other. The suggestion that the plaintiffs were in some way connected with those calls is without any basis of fact so far as the evidence is concerned. Similarly, the suggestion that some of the defendants were responsible for the calls is not supported by the evidence. In fact, it seems that the charges made against both plaintiffs and defendants in that regard are founded entirely upon mutual suspicion of the parties.

The results of the telephoned offers, coupled with certain other facts, were disastrous. Rumors spread like a prairie fire and panic seized the Village residents. Mass meetings were held, protests were lodged, and committees were formed to resist the sales program of Progress.

Viewed from any angle, the attitude of some of the Village residents was deplorable—based as it was on animosity and resentment at the prospect of having Negro neighbors. It must be observed, however, that many of the Villagers who were the most aroused and who raised the most commotion were animated by the telephoned offers to purchase their homes at reduced prices. Most of these people have all of their life savings invested in their homes and the prospect of losing that security was a greater factor than the thought of Negro neighbors. Fear gripped the community and fear is the very base and foundation of hate and intolerance.

Meanwhile, the true plan of the plaintiffs was revealed. They announced that they had made a social survey and that the normal population ratio for whites and non-Caucasians in the Chicago area was approximately 78 to 80 per cent white and approximately 22 to 20 per cent non-Caucasian; that since that was the Chicago-area norm, they proposed to sell to Negroes or other non-Caucasians from 10 to 12 of the houses they proposed to build and that the ratio between the races once being established would thereafter be controlled by the plaintiffs. They were not clear about the method of control but stated that such a plan was necessary in order to maintain a stable integrated community and to prevent the subdivision from becoming a ghetto, either all white or all Negro. Needless to say, the disclosure of the plan by Morris Milgram, president of Modern, added new fuel to the flames.

Plaintiffs stated in open court that they would not sell 100 per cent or 50 per cent of the proposed houses to Negroes as that would be contrary to their plan. They insisted that they would sell only upon their formula of approximately 80–20. Plaintiffs claim, and their counsel argues, that the plan is voluntary, yet in the same breath they say that this plan must and will be controlled. The two terms are absolutely inconsistent. The fact appears to be that since this controversy has arisen, and plaintiffs see the horns of the dilemma with which they are faced, they have delayed the adoption of formal minutes in their corporate meetings to make the signing of such an agreement compulsory.

■ The court finds that Progress is under the domination of Modern which, in turn, is dominated by Morris Milgram and that under such domination Progress devised a plan of controlled integration for the Village of Deerfield which required that each purchaser, as a condition precedent to his purchase, execute a separate re-sale agreement which is not to be recorded. This agreement with Progress gives the latter the exclusive right to select a purchaser for the property in the event of a re-sale of said premises. Progress would re-sell to an-

other person of the same race as the original purchaser and the initial integration ratio would be continued.

Progress' plan is clearly a device to restrict the conveyance of real property to persons of a certain race. In an evident effort to circumvent the law as laid down in Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161, and Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149, Progress attempts to accomplish its purpose by requiring the execution of separate, unrecorded "Resale Agreement"(s) incorporating appropriate restrictive language—all of which is fortified and implemented by certain minutes and corporate resolutions separately entered or adopted by Progress and Modern.

A controlled integration plan with discriminatory restrictions, albeit they are not recorded and are not in the form of covenants contained in a deed, cannot be enforced in any court in the United States. It would amount to a quota system of housing and that is just as illegal as the quota system of employment that a group of Negroes sought to enforce on a department store in Los Angeles, California, in Hughes v. Superior Court, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985. In that case, the Supreme Court, in a unanimous decision, outlawed a compulsory employment system. Mr. Justice Frankfurter delivered the opinion of the court and, quoting from the language of the Supreme Court of California (32 Cal.2d 850, 856, 198 P.2d 885) said, at page 464 of 339 U.S., at page 720 of 70 S.Ct.:

"'* * * If petitioners were upheld in their demand then other races, white, yellow, brown and red, would have equal rights to demand discriminatory hiring on a racial basis. Yet that is precisely the type of discrimination to which petitioners avowedly object.'"

If a population quota of 80 to 20, founded upon unrecorded restrictive agreements is constitutional, then a quota of 50 to 50 or 99 to 1 or even 100 to 0 would be constitutional and Shelley v. Kraemer, supra, would be circumvented.

True, plaintiffs' plan may appear attractive to Negroes at the particular moment in a particular place, but it would constitute a strait jacket. It is but a mess of pottage offered in exchange for a birthright of equality.

At various public meetings defendant Harold C. Lewis and other village residents called upon some of the many lawyers who reside in Deerfield and asked that they advise whether a legal and constitutional way could be found out of the "Deerfield dilemma," as some of the residents called it. Numerous meetings were held, some boisterous and noisy. Many charges were made against the plaintiffs by defendant Harold C. Lewis and by unknown persons, and words such as "totalitarian" were used in describing plaintiffs' plans. On the other hand, some of plaintiffs' supporters referred to defendants and others as "bigots".

The officials of Deerfield called public meetings and heard both sides of the dispute. The president of the Village, Joseph Koss, conducted those meetings in a manifestly fair and orderly manner. Deerfield can be proud of the sane and sober manner in which its Village and Park District officials have acted during this turbulent period.

While all of this was happening, defendant James C. Mitchell and other members of the Deerfield Park District Board took stock and concluded that it was an ill wind which blew no one any good. In the words of defendant James C. Mitchell, they believed it was an opportune time to call another referendum in an attempt to get for the School-Park Program the land which the Park Board and defendant Mitchell and his wife (a member of one of the school boards) had long looked forward to obtaining. The Park Board struck while the iron was hot and called the referendum of December 21, 1959. The idea was that of the Park Board and was no part of any conspiracy involving the Village officials or any other defendants or any other per-

sons. In fact, defendant Harold C. Lewis and other persons were planning some action to seek an injunction halting plaintiffs' program.

The right of Modern to be a plaintiff in this cause can be disposed of with dispatch. Although Modern owns all of the outstanding and issued shares of stock in Progress, it nevertheless stands in the same position as would a holder of fewer shares. It must act through Progress for any injury it claims to have been done to Progress.

Modern's claim of indirect damage to its sale of stock and to its reputation outside Illinois, resulting from acts done in Illinois to a corporation in which it owns stock, and while Modern was not qualified to do business in Illinois, is too absurd to warrant serious discussion or notice by this court even though such claim of action is cloaked under the Civil Rights Statutes.

Through prospectuses and registration statements filed with the Securities and Exchange Commission as of August 5, 1958 and October 9, 1959, and otherwise, Modern holds itself out as being engaged primarily, or proposing to engage primarily, in the business of investing and reinvesting in the securities of housing and real estate enterprises in various States. Since August 5, 1958, Modern has been endeavoring to sell to the public in numerous States $1,500,000 of its stock by direct offer without intervention of an underwriter. As of December 31, 1959, it had sold 5,876 shares for a total subscription price of $587,600 of which about $489,300 had actually been paid in.

Modern is engaged and proposes to engage in the business of investing, re-investing, owning or holding securities. It presently owns investment securities having a value exceeding 40 per cent of the value of its total assets exclusive of Government securities and cash items on an unconsolidated basis.

Modern has not registered as an investment company with the Securities and Exchange Commission pursuant to the Investment Company Act of 1940, 15 U.S.C.A. § 80a–1 et seq.

Without registering as an investment company, Modern has offered for sale, sold and delivered, and proposes to continue so to do, securities and interests in securities and otherwise to conduct interstate commerce.

Through prospectuses issued in connection with the sale of its shares pursuant to the Securities Act of 1933, 15 U.S.C.A. § 77a et seq., Modern made statements and representations which do not disclose extensive contingent liabilities for the purchase of stock in companies organized by it or that it proposes to organize, that are speculative in nature. Such prospectuses failed to disclose material facts as follows:

(a) Modern has made commitments or pledges of $501,000 to certain subscribers for its shares which are not reflected in its latest prospectus. This is a large and material liability.

(b) Its prospectus entitled "Facts about Investing in Open Occupancy Housing" states that its purpose is to develop housing open to all persons regardless of color or race. (The admitted fact, on the other hand, is that the Deerfield subdivisions will not be open without regard to color or race to the first 51 purchasers who may appear and be able to buy. Modern's true purpose is to "control" occupancy in the subdivisions by means of a racial quota system. Thereafter Modern will seek to control, so far as it is able, the re-sale of the lots through so-called resale agreements in order to perpetuate and further control the quota. This "quota system" is a negation of "open occupancy.") The prospectus fails to contain facts necessary not to make it misleading as to Modern's true purposes.

(c) In its prospectus, Modern represents that its president, Morris Milgram, was engaged "in labor relations work" for ten years prior to 1947 when, in fact, he was not so engaged in any usual or ordinary use of the term "labor relations work" but was engaged with an organization known as the War Resistors'

League during the years from 1941 through 1945 which could in no way be construed as labor relations work. Accurate and non-misleading biographical material is of special importance to potential investors who must rely in substantial part upon the past history and performance of the principal officers of a new company in endeavoring to form an opinion as to the possibilities of the success of such a company.

(d) Modern fails to state in its latest prospectus that it has made special offers, inducements and representations to prospective purchasers of its shares in the States of New Jersey, Iowa and Connecticut that if they subscribe or assist in securing subscriptions for substantial amounts of its shares, Modern will make large investments in those States. The persons to whom such offers were made responded thereto by purchasing shares, and Modern considers itself obligated to them to make investments in said States which will total approximately $325,000.

(e) In Modern's current (1959) prospectus it is stated that one of its wholly-owned subsidiaries had taken over the business and assumed the liabilities of a partnership. It omitted to state that the partnership was one in which several of Modern's officers bore partnership liability—including a ⅖ths interest by Morris Milgram who at the same time was and is drawing a substantial salary from Modern. The prospectus fails to reveal the further material facts in this respect that this subsidiary is Concord Associates, Inc., a corporation created by Modern in January, 1959; that Concord was not expected by Modern to show a profit; and that to the knowledge of the directorate of Modern, it has, in fact, operated at a substantial loss ever since its creation.

Plaintiffs Modern and Progress have instituted a program of integration which they claim will be an immediate answer to the racial problem in this country. On November 16, 1959, at a meeting of 15 to 20 Deerfield residents at the Deerfield home of Adrien Ringnette, Morris Milgram, the guiding spirit of the enterprise, told those present that the integration plan was not voluntary. During the hearings in this matter, however, plaintiffs claimed that the plan was to be on a voluntary basis. When that plan is examined as it has been applied in other communities and is proposed to be applied in Deerfield, it becomes clear that its effect will be integration which is forced and controlled. Moreover, it will not be by proper authorities but by a private corporation.

If there is to be controlled or forced integration, it is most certainly a matter for action by the people through their government and not by a private corporation which, when all is said, has as its object the motive of profit not only for its stockholders but also for its promoters.

It is significant that no Negro has purchased or offered to purchase any of plaintiffs' houses in Deerfield.

Had a plan, similar to the one sponsored by plaintiffs, been adopted in Chicago twenty years ago—when the Negro population was nearer to 10 than to 20 per cent of the whole—today's Negro population of that city would be hard put to find homes there.

Had Progress merely announced that it planned to sell houses to Negroes and to Whites, alike and had it honestly sought to interest Negroes in purchasing its houses, it is entirely likely that some of those houses would have been sold to and occupied by Negroes who would have lived there in peace just as they have been doing in many other Chicago suburbs such as Evanston, Glen Ellyn, Wheaton, and Maywood, just to name a few. Apparently both races resented the strictures of the plan as well as the paternalistic attitude of plaintiffs that went with it.

Property owned by Progress in Deerfield is subject to the sovereign right of eminent domain, just as is the property of every other person in that Village.

The court takes judicial notice and finds that Progress has an adequate remedy at law in the Circuit Court

of Lake County, Illinois, where it may by jury trial be justly compensated for the loss of its property and may also obtain any special damages which it may be able to prove. Furthermore, it may again raise in that court and have heard on its merits its claim that the Park District has no need for the premises belonging to Progress, and that the Park District is acting in an arbitrary, capricious and discriminatory manner.

A mere claim of violation of constitutional rights is not sufficient to give this court jurisdiction in a condemnation proceeding. Combs v. Illinois State Toll Highway Commission, D.C., 128 F.Supp. 305, affirmed 349 U.S. 942, 75 S.Ct. 875, 99 L.Ed. 1269.

As hereinabove stated, under 28 U.S.C. § 2283, this court has no authority to restrain judicial proceedings in State courts except where it is necessary in aid of or to protect its jurisdiction. No such showing has been made in this case. Moreover, this court has no jurisdiction in this cause for the reason that no civil right is involved.

Progress has made no allegation in its complaint that it has been denied the right to buy other property in Deerfield or to conduct and carry on its business otherwise in the Village of Deerfield.

This is not a case of a municipality selecting property for park use where none is needed, or selecting property which is not suitable for park purposes, or taking only property that belongs to Negroes and leaving untouched that which belongs to Caucasians, or taking only property which is to be sold to Negroes while not taking that which is to be sold to Caucasians.

Plaintiffs allege they have been damaged in the sum of $750,000 but nowhere in their complaint praying injunctive relief do they allege or offer to prove that the defendants could not respond and meet the amount of damages claimed.

The court finds that the general allegations of damages set forth in the complaint are highly speculative and are not in any way supported by the proof. The proof shows that plaintiff Modern had received $489,300 from the sale of stock, and the balance sheet showed a net worth of $394,959.04 as of December 31, 1959. For the period January 1, 1959 to December 1, 1959, the balance sheet showed a net operating loss of $59,089.44.

Progress paid a total of $113,000 for the Floral Park and Pear Tree tracts and has expended $30,000 for improvements. The amount expended upon the two houses appears to be not in excess of $30,000, making a grand total of $173,000 that the property has cost Progress.

The obligations upon improvement bonds would be assumed by the Park District if it takes the property for park purposes.

The value of $250,000 placed upon the property in the complaint is arrived at by allowing approximately $5,000 as the price for each building lot after houses have been constructed thereon, which is not the fair cash market value of such lots in their present state.

In arriving at its conclusions and decision in this matter, the court has considered the affidavits filed in support of defendants' motions to dismiss Count III and the whole complaint as well as the failure of the plaintiffs to respond or to file counter or replying affidavits thereto; all evidence adduced and all exhibits introduced, including resolutions adopted by Progress, tentative forms of agreements for submission to purchasers, forms which were actually used by Modern in controlling the racial proportions in another development; statements and argument of counsel; testimony of all witnesses, including that of Morris Milgram, president of Modern, and of Max Weinrib, executive vice-president of Progress.

The court is of the opinion that both motions made by plaintiffs for preliminary injunction should be denied, not only upon the grounds set forth herein but also upon the merits.

Because the evidence introduced at the hearings was contrary to the allegations of the complaint which induced this court

to issue its order restraining the defendant officials of Deerfield from enforcing the Deerfield Building Code in a discriminatory manner, it is the duty of this court to grant the motion of the defendants named in Count II to dissolve said restraining order which by its terms expired on January 6, 1960. Since by the terms of that restraining order the defendants were not enjoined from doing any specific act, and their lawful duties were specifically exempted from the provisions of the order, they were, in effect, enjoined only from doing any unlawful act. Therefore, no damages can be shown under the bond given at the time said order was made.

The court is of the opinion that motions made by defendants to dismiss Counts I, II and III should each be granted and that the complaint herein should be dismissed for the reason that the rights claimed to be violated are not rights which are protected by the Fourteenth Amendment to the Constitution of the United States nor are the acts complained of in violation of the Civil Rights Statutes.

Based on the foregoing, the court states the following additional, specific conclusions of law:

1. This court has jurisdiction of the parties to this suit and of the subject matter thereof.

2. The Federal Civil Rights Statutes created rights which may be protected by federal courts in the exercise of their normal equity jurisdiction. These statutes, however, have not broadened the controlling equitable doctrine, and relief may be denied on well-established principles. Existing standards are to be used to determine the propriety of equitable relief.

3. In a motion for a preliminary injunction, the burden of proof is upon the complaining party.

4. The burden is on the plaintiffs to prove that this court should issue a temporary injunction restraining the prosecution of the condemnation proceedings in the Circuit Court of Lake County, Illinois.

5. The award of a preliminary injunction is a matter within the sound discretion of the court. It is not a matter of right, even where irreparable injury may result to the plaintiff. Injunctive relief is a drastic remedy and courts should proceed with caution in granting such relief.

6. In order to be entitled to a preliminary injunction, plaintiff must show that there is a likelihood that he will finally prevail on the merits.

7. Only a case of manifest oppression will justify entry of an injunction by a federal court against a State official acting under the color of his office in his conscientious endeavor to discharge his official obligations and duties.

8. The proofs taken with all intendments in favor of the plaintiffs fail to show any grounds for a temporary injunction under Count I of the complaint.

9. The burden is on the plaintiffs to prove that the Commissioners of the Deerfield Park District conspired to deprive the plaintiffs of their rights under the Constitution of the United States and the Federal Civil Rights Acts.

10. The proofs taken with all intendments in favor of the plaintiffs fail to show any conspiracy on the part of the commissioners of the Deerfield Park District.

11. The plaintiffs have failed to establish by a preponderance of the evidence that they are entitled to the entry of a preliminary injunction herein as prayed against the defendants named in Count II of the complaint and that plaintiffs' request for such preliminary injunction should be denied.

12. In view of the evidence and extensive hearing had on Count II there is no further reason for said Count II to remain pending herein and that the said Count II should be dismissed.

13. The court concludes after hearing all the evidence that it was without jurisdiction to grant the temporary restraining order entered herein on December 22, 1959 and that the order should be dissolved.

14. The court further concludes that inasmuch as the defendants were not restrained from doing any specific act, were not restrained from performing their lawful duties, and were only restrained from doing illegal acts, that no damages could or have accrued under the bond herein.

15. The proofs taken with all intendments in favor of the plaintiffs show no illegal motive of the Commissioners of the Deerfield Park District in instituting condemnation proceedings against the premises described in paragraph 11 of the Complaint.

16. The acts of the Commissioners of the Deerfield Park District do not constitute an unlawful conspiracy.

17. The Commissioners of the Deerfield Park District in instituting condemnation proceedings against the premises described in paragraph 11 of the Complaint were acting in their legislative capacity and are immune to the claim for damages alleged in Count III.

18. This court cannot consider the motives of the Commissioners of the Deerfield Park District in instituting condemnation proceedings against the premises described in paragraph 11 of the Complaint.

19. Motives cannot be inquired into when the sovereign speaks directly—that is, when the people vote as they did in this case—nor can motives be inquired into when the sovereign speaks indirectly—that is, through a legislative body, as it did through the members of the Board of the Deerfield Park District in this case. The court specifically finds that the officials of the Deerfield Park District Board had no motive of bias or discrimination against the plaintiffs when those officials acted as they did.

20. The purest of motives and the best of purposes by the sovereign in State government, acting either directly or through its legislators, cannot save a statute, ordinance or resolution that is contrary to the Constitution of the United States. And, of course, the same holds true of administrative or executive acts that are done under color of law.

21. Modern Community Developers, Inc., is an unregistered investment company within the meaning of the Investment Company Act of 1940; as such, it cannot engage in interstate commerce; and its contracts are void and unenforceable.

22. Modern Community Developers, Inc., had made as of the date of commencement of this action several false and misleading statements and had failed to disclose material facts in registration statements and prospectuses filed with the Securities and Exchange Commission and under which it seeks to sell shares of stock in interstate commerce. It cannot found a cause of action upon any believed right to sell stock under an illegal prospectus.

23. The power and authority of the State of New Jersey were used to create Modern Community Developers, Inc.

24. The power and authority of the State of Illinois and its subdivisions were used to charter Progress Development Corporation and to subdivide the tracts of land acquired by it for development.

25. The plaintiff, Modern Community Developers, Inc., is not a proper party plaintiff and should be dismissed.

26. The "controlled occupancy pattern" which the plaintiffs propose is a racial discrimination and in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States and is unenforceable in any court of law or equity in the United States.

27. The "controlled occupancy pattern" which the plaintiffs propose is a racial discrimination and is not protected by Sections 1981, 1982 and 1985, Title

42 U.S.C.A., and is unenforceable in any court in the United States.

28. The "controlled occupancy pattern" which the plaintiffs propose is illegal and the plaintiffs do not come into a court of equity with clean hands.

29. The "controlled occupancy pattern" which the plaintiffs propose is illegal and the plaintiffs cannot predicate the cause of action claimed in Count III thereon and Count III should be dismissed.

30. The "controlled occupancy pattern" and resale quota system which Modern Community Developers, Inc., proposes to use in Deerfield through Progress Development Corporation is illegal both as to initial sales and resales. The power of a federal court cannot be used consistently with the Fifth Amendment and the Civil Rights Statutes to impose any percentage quota of Negro or Caucasians. Similarly, State power and authority cannot be constitutionally employed within the restrictions of the Fourteenth Amendment to control either the original or subsequent devolution of realty on a quota basis.

31. A party who plans to put into effect a system of land tenure whereby ownership or occupation of land will be controlled on racial or other discriminatory bases cannot seek damages in a federal court for any interference which prevents such party from putting such plan into effect.

32. An action against public officials as individuals for damages arising from alleged tortious acts pursuant to a claimed conspiracy should not allege mere conclusions of the pleader but must state facts from which the conclusion is inevitably drawn that the officials did in fact use their office for the sole object of depriving plaintiffs of their constitutional rights.

33. In an action for conspiracy under the Federal Civil Rights Acts, it must be alleged that the conspirators have committed an act or acts in furtherance of the conspiracy whereby the plaintiff is injured in his person or property, irrespective of whether the conspirators proceed under color of authority of State power or otherwise.

34. The mere attendance at meetings of public officials in their individual private capacity is not such an overt act as is required to satisfy the allegation of an actionable conspiracy under Section 1985 of Title 42 of the U.S.C.A.

35. Where the court has conducted extensive hearings on motions for preliminary injunction, and where it appears that the plaintiffs have had ample opportunity to examine and cross-examine witnesses on all issues well pleaded, and it further appears that the issues are all in favor of the defendants and no further issues of fact remain to be determined, it is proper to entertain a motion for summary judgment in favor of the defendants.

36. None of the provisions of Sections 1981, 1982 or 1983 of Title 42 of the U.S.C.A. are violated by the actions of the Park District or Park Commissioners herein. Progress Development Corporation is subject to the same exactions as are other citizens—the exaction of having its property taken by the eminent domain power granted to governmental, legislative bodies. No right is given to Progress superior to that granted all other citizens and they likewise hold their property subject to the superior right of eminent domain exercised by governmental agencies.

37. No civil rights of the plaintiffs have been impaired or jeopardized.

38. No right that is unenforceable in a court of law or equity, in any court in the United States, can be classified as a civil right.

39. The mere intention to take some action at some time in the future, which might or might not occur, and which if it does occur might present a situation coming under the Civil Rights Act, does not present any justiciable question under the Civil Rights Act at this time.

40. A party who has admittedly violated the law cannot complain that a penalty was invoked against him where it appears that the enforcement was in accordance with the statute and that it was properly exercised.

41. Although the court will protect a proper party in so far as equal protection of the laws may be involved, it cannot determine relative degrees of punishment where the punishment is within the law and the element of its degree is a matter of sound permissible discretion of the enforcing officer.

42. Because of the provisions of 28 U.S.C.A. § 2283, this court has no jurisdiction to restrain the condemnation proceedings pending in the Circuit Court of Lake County, Illinois, unless the plaintiffs prove that there is need for equitable jurisdiction in aid of the court's jurisdiction under the Civil Rights Statutes and this the plaintiffs have failed to prove in this cause.

43. The plaintiff, Progress Development Corporation, has an adequate remedy at law in the condemnation proceedings pending in the Circuit Court of Lake County, Illinois.

44. Count I of the Complaint should be dismissed because the relief claimed therein is barred by 28 U.S.C.A. § 2283 unless the plaintiffs prove such is necessary in aid of the equitable jurisdiction of the court, and this they have failed to prove in the case at bar.

45. Count I should be dismissed because no conspiracy, or any semblance of a conspiracy, on the part of the Park Board Commissioners was proved.

46. Count I of the Complaint should be dismissed because the plaintiffs do not come into this court of equity with clean hands.

47. Count I of the Complaint should be dismissed because the plaintiffs have an adequate remedy at law.

48. The Complaint as explained by plaintiffs fails to state a claim upon which relief can be granted and should be dismissed with prejudice and at plaintiffs' costs.

The decision upon the facts in this case can be of no comfort to any group of individuals or to any community which might violate the civil rights of Negroes or other minority group members. This case is decided upon the facts as established by competent evidence in this particular case—facts that completely overcome the unsupported allegations of the Complaint herein.

This memorandum opinion contains a full statement of the essential facts as well as of the conclusions of law applicable thereto in conformity with Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A.

Appropriate orders are being entered simultaneously herewith.