Yvette M. WRIGHT, Horacio L. Quinones, Darwin Bolden, Benny Cartagena, Ramon Diaz, Joseph E. Erazo, Blorneva Selby, Walsh McDermott, Seth Dubin, all individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

Nelson A. ROCKEFELLER, Governor of the State of New York, Louis J. Lefkowitz, Attorney General of the State of New York, Caroline K. Simon, Secretary of State of the State of New York, and Denis J. Mahon, James M. Power, John R. Crews and Thomas Mallee, Commissioners of Elections constituting the Board of Elections of the City of New York, Defendants,

and

Adam Clayton Powell, J. Raymond Jones, Lloyd E. Dickens, Hulan E. Jack, Mark Southall and Antonion Mendez, Defendant-Intervenors.

United States District Court
S. D. New York.
Nov. 26, 1962.

———

Justin N. Feldman, Jerome T. Orans, Leo M. Drachsler, Edward J. Bloustein, Bruce McM. Wright, New York City (James M. Edwards, Elsie Quinlan, George M. Cohen, New York City, on the brief), for plaintiffs.

Louis J. Lefkowitz, Atty. Gen. of New York, Albany, N. Y., Irving Galt, Asst. Sol. Gen., and Sheldon Raab, Deputy Asst. Atty. Gen., of counsel, for defendants, Nelson A. Rockefeller, Louis J. Lefkowitz, and Caroline K. Simon.

Leo A. Larkin, Corp. Counsel of the City of New York, Benjamin Offner, Asst. Corp. Counsel, of counsel, for defendants, Denis J. Mahon, James M. Power, John R. Crews and Thomas Mallee, Commissioners of the Board of Elections of the City of New York.

Jawn A. Sandifer, William C. Chance, Jr., Robert W. Seavey, Morris Sterenbuch, New York City, for defendant-intervenors.

Before MOORE, Circuit Judge, and MURPHY and FEINBERG, District Judges.

MOORE, Circuit Judge.

Plaintiffs bring this action allegedly "to redress the deprivation, under color of the law of the State of New York, of rights, privileges and immunities secured to the plaintiffs under the Constitution and laws of the United States and to declare unconstitutional that portion of the State statute in question which deprives the plaintiffs of their rights, privileges and immunities". More specifically, they claim that the action arises under the Fourteenth and Fifteenth amendments of the Constitution of the United States, the Civil Rights Act (42 U.S.C. §§ 1983, 1988 and under 28 U.S.C. §§ 1343, 2201, 2202 and 2281). The relief sought is that a three-judge constitutional court hear and determine the case; that such portion of Chapter 980 of the 1961 Laws of New York, State Law, §§ 110–112, as describes the boundaries of the 17th, 18th, 19th and 20th Congressional Districts be declared unconstitutional; that a preliminary injunction issue against the primary election on Sep-

tember 6, 1962 [1] and the general election on November 6, 1962 on the basis of such boundaries; that a permanent injunction issue; that unless a redistricting of such four districts be made, there be an election at large in New York County for the four Congressional seats in said County; and that absent such legislative action, the court appoint a special master to redefine the boundaries of the four districts in question.

The plaintiffs allege that they reside and are registered voters in these respective districts and that each brings the action on his own behalf and all other residents of the respective districts. They ask, because of their claim that they "fairly and adequately represent" these other registered voters, that this be considered a "class suit".

The portion of the statute (Chap. 980) under attack establishes, according to plaintiffs, "irrational, discriminatory and unequal Congressional Districts in the County of New York and segregates eligible voters by race and place of origin". Plaintiffs charge that the 17th Congressional District was "contrived" to exclude "non-white citizens and citizens of Puerto Rican origin" and that the 18th, 19th and 20th districts "have been drawn so as to include the overwhelming number of non-white citizens and citizens of Puerto Rican origin in the County of New York". They also assert that the 17th is "over-represented" and the 18th, 19th and 20th are "under-represented".

This situation, plaintiffs say, has existed for many years, that there have been repeated and energetic efforts to seek legislative correction of the abridgement of plaintiffs' constitutional rights but that they have been of no avail "because of the existing unconstitutional apportionment of the Legislature of the State of New York"; that the Legislature in successive statutes has redrawn the district boundaries in accordance with shifts in non-white and Puerto Rican populations and that the 17th has a population 12% less than the 18th,

15.4% less than the 19th and 14% less than the 20th. These allegations have been set forth at some length because of the necessity of ascertaining whether they have been established by the proof.

At the opening of the trial six individuals, Adam Clayton Powell, J. Raymond Jones, Lloyd E. Dickens, Hulan E. Jack, Mark Southall and Antonio Mendez, by counsel moved to intervene. They were represented to be duly enrolled members of the Democratic Party and district leaders of the area comprising the 11th, 12th, 13th and 14th Assembly Districts. Adam Clayton Powell, a Negro, is now serving as Congressman from the (pre-1961) 18th Congressional District. Intervention was granted. The intervenors thereupon served their answer as intervening defendants alleging six defenses which, amongst other matters, denied that plaintiffs represented the class to which the intervenors belong and that the redistricting of the four Congressional Districts in question deprived plaintiffs of their constitutional rights. As affirmative defenses they alleged, in substance, that the test for Congressional representation is based on population rather than race, that the Republican-controlled Legislature drew the new district boundaries "along partisan political lines rather than racial lines" to "cut out as many democrats as they possibly could", that judgment as sought by plaintiffs would place in jeopardy the constitutional rights of Negroes and Puerto Ricans to representation in Congress, that a County-wide election at large would "deprive Negroes and Puerto Ricans and other minorities of fair representation and equal protection under the law", that this is not a proper class action, that "the real party in interest in this law suit is the Democratic County Committee of the County of New York", that said Committee of which intervenors are members never authorized or approved plaintiffs' action, and that plaintiffs are estopped from bringing this action because of their failure to com-

1. Request withdrawn during trial.

mence it until some time after June 21, 1962 the initial date for nominating petitions.

On the trial, plaintiffs presented certain statistical material gathered from the 1960 census figures and various maps of Manhattan Island (New York County). At the request of the court, counsel for the Attorney-General submitted maps showing the many Congressional district changes since 1911. No proof was offered by any party that the specific boundaries created by Chapter 980 were drawn on racial lines or that the Legislature was motivated by considerations of race, creed or country of origin in creating the districts. Plaintiffs rely entirely upon their analyses and version of certain statistics and would impute to the Legislature the inferences they draw therefrom.

After the Eighteenth Decennial Census (1960) had been taken, the President according to law (2 U.S.C. § 2a) transmitted to the Congress a statement under date of January 10, 1961 showing the number of persons in each State and "the number of Representatives to which each State would be entitled under an apportionment of the existing number of Representatives by the method of equal proportions. The statement disclosed a total population of 179,323,175 for the United States and 16,782,304 for New York State. Apportioning the 435 Congressional Representatives amongst the States, New York became entitled to 41 instead of the 43 previously allotted under the 1950 census.

As a result of this required change, the Joint Legislative Committee on Reapportionment submitted to the Second Extraordinary Session of the New York Legislature on November 9, 1961 its interim report (see McKinney's Session Laws of New York, 1962, at 63, 64) wherein it stated the need for legislative action, namely, that because of the reduction in Congressional seats all the Representatives of the State would have to be elected at large "unless new districts not exceeding in number the number of Representatives apportioned to the state shall be created". The Committee briefly reviewed the history of the Congressional district system as follows:

In the early days of the Republic, some of the states elected by districts and some at large. The desire for local representation, however, gradually led to the adoption of the district method by the majority of the states. By 1842, of the states entitled to more than one Representative, 22 were electing their Representatives by districts, and only 6 were electing at large.

As the practice of electing by districts became firmly established, Congress, in connection with the succeeding apportionments of Representatives among the states, enacted statutes setting standards for the election of Representatives within the several states. In connection with each decennial census from 1840 to 1910, with the exception of the census of 1850, Congress enacted a law of this character. The last of these laws was the Act of August 8, 1911 (2 U.S.C.A. § 2) (37 Stat. L. 13), which provided that districts should consist of contiguous and compact territory and contain as nearly as practicable an equal number of inhabitants. There was no apportionment Act after the census of 1920. The permanent act of June 18, 1929 (46 Stat.L. 13), as originally enacted and as amended by the Act of April 25, 1940 (2 U.S.C.A. § 2a) (54 Stat.L. 162), contained no standards for the creation of districts. In Wood v. Broom, 287 U.S. 1, 53 S.Ct. 1, 77 L.Ed. 131, a case involving the creation of Congressional districts after the apportionment under the Act of 1929, the Supreme Court held that the provisions of the Act of 1911 requiring that districts be of contiguous and compact territory and, as nearly as practicable of equal population, applied only to districts to be formed under the Act of 1911. In Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed.

1432, Plaintiffs urged that an act creating Congressional districts substantially unequal in population be held invalid as violating the Fourteenth Amendment of the Federal Constitution. In that case the Supreme Court in its opinion, after citing with approval Wood v. Broom, supra, stated that it was not within the competence of the court to grant the relief asked by the Plaintiffs.

Since the above cases, various bills have been introduced in Congress to provide standards to be followed by the state legislatures in creating Congressional districts. None of those bills has been enacted into law. At the present time, therefore, there are no Federal standards binding upon the states in creating Congressional districts, and there are no such standards to be found in the Constitution or statutes of New York.

The Committee then set forth the standards used by it in preparing its proposed bill, stating:

In the absence of Federal and State constitutional and statutory standards governing the creation of Congressional districts, your Committee has been obliged to determine for itself what, if any, such standards should be adopted by it in the preparation of a bill to be recommended to your Honorable Bodies. It is the conclusion of your Committee that the most important standard is substantial equality of population.

While exact equality of population is the ideal, it is an ideal that, for practical reasons, can never be attained. Some variation from it will always be necessary. The question arises as to what is a permissible fair variation.

Your Committee has examined reports of Committee hearings on bills introduced in Congress bearing upon this subject, and reports and publications of authorities on this subject. Variations of from ten to twenty per cent from average population per district have been suggested from time to time. After considerable study, your Committee decided that a maximum variation of fifteen per cent from average population per district, the variation recommended by the American Academy of Political Science and endorsed by former President Truman, would preserve substantial equality of population and permit consideration to be given to other important factors such as community of interest and the preservation of traditional associations.

In addition to keeping the districts in its proposed bill within the maximum of the fifteen per cent variation from average population per district, your Committee has also created proposed districts of contiguous territory and has endeavored to preserve the several metropolitan areas of the state either in single districts or, where large populations made that impossible, in contiguous and closely allied districts.

New York City was singled out for special comment as follows:

In an attempt to assist the members of the Legislature in their analysis of the consideration given Metropolitan New York by your Committee we would like to point out that the population of New York City according to the 1960 Federal decennial census is 7,781,984. 19 districts have been created in the City with an average population of 409,578 per district. The remainder of the state has a population of 9,000,400 and has 22 districts with an average population of 409,109 per district. The total population of the state is 16,782,384. Dividing this population by 41, the total number of Representatives, gives an average population per district throughout the State of 409,326. A mere inspection of these figures will demonstrate that there has been no dis-

crimination against New York City in the proposed bill.

Refining the population figures still further, it is obvious that New York County (Manhattan) with its population of 1,698,281 has approximately one-tenth of the total State population of 16,782,304 and, hence, should have on an equal proportion basis one-tenth of the 41 Congressional seats. This it has in being allotted four seats.

Plaintiffs do not question the necessity for the reduction of Congressional districts in the State from 43 to 41 nor the boundaries of the 37 districts outside of New York County. Inspection of these 37 districts discloses a variation in population within New York City of from 469,908 in the 12th District (Brooklyn) down to 349,850 in the 15th District (also Brooklyn) and 348,940 in the 24th District (Bronx); and in the upstate (in relation to New York City) and rural areas of from 460,409 in the 30th District comprising the counties of Saratoga, Washington, Warren, Fulton, Hamilton, Essex, Clinton and part of Rensselaer to 353,183 in the 31st District consisting of St. Lawrence, Jefferson, Lewis, Franklin and Oswego counties. An example of a merger of rural and suburban interests is found in the 25th District where Putnam's (rural) population (31,722) is merged with part of Westchester's (largely suburban) 406,687. Separating the 19 New York City districts from the 22 in the rest of the State, if the 7,781,984 persons in New York City were equally divided amongst 19 districts, there should be 409,578 persons in each district. The remaining 9,000,000 persons divided into 22 districts should provide an average of 409,109 per district.

These figures are thus analyzed because plaintiffs frequently employ the words "under-represented" in relation to the size of the 18th, 19th and 20th districts, namely, 431,330, 445,175 and 439,456, respectively, and "over-represented" with respect to the 17th district (382,320). Testing these numbers by taking the Legislative Committee's "maximum variation of fifteen per cent from average population per district", the largest New York County district, the 18th, is less than 9% above the average and the smallest, the 17th, less than 7% below the average. Only in Kings County is found the widest range of almost 15% above and below the mean.[2]

During the trial the court made every effort to ascertain the real basis of plaintiffs' claim of constitutional violation. Plaintiffs stated that they intended to prove that the Legislature in enacting Chapter 980 of the Laws of 1961 "segregated the voters [in Manhattan] by virtue of race and place of origin". They limit, however, their "race" to "non-white" and their "place of origin" group to Puerto Rico. Selecting certain catch phrases from one of the Gomillion opinions (Mr. Justice Whittaker), they argue that the Legislature intentionally fenced Negro citizens out of the 17th District and fenced them into the 18th, 19th and 20th Districts. They ask this court to find an unconstitutional Legislative intent solely on the basis of their analysis of the population content of these districts.

At the outset this court (and courts generally) should be ever watchful that it is not being made the pawn of warring political factions.[3] More than suspicion of this possibility is created by the pleadings. The intervenors assert that they

2. As Mr. Justice Rutledge pointed out in his concurring opinion in Colegrove v. Green, 328 U.S. 549, 566, 66 S.Ct. 1198, 1209, 90 L.Ed. 1432, 1443:
    "There is not, and could not be except abstractly, a right of absolute equality in voting. At best there could be only a rough approximation. And there is obviously considerable latitude for the bodies vested with those powers to exercise their judgment concerning how best to attain this, in full consistency with the Constitution."

3. In Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432, Mr. Justice Frankfurter wrote:
    "Nothing is clearer than that this controversy concerns matters that bring courts into immediate and active rela-

are the six district leaders in Assembly Districts embraced within the Manhattan Congressional Districts and that the 18th District from which Congressman Powell is the present representative and others in "public office" would be affected by any judgment in favor of plaintiffs.

Upon the trial no proof was offered which would justify a finding that plaintiffs represented a "class"; in fact, the intervenors' opposing claim dispels any such conclusion. Neither plaintiffs nor the intervenors can speak for, or truly represent the wishes of, some 400,000 persons in their districts. Each individual, however, is entitled to the benefits of constitutional equal protection and due process. But to receive judicial support for their respective causes, they must show more than a mere preference to be in some other district and associated for voting purposes with persons of other races or other countries of origin.

Plaintiffs' theories of unconstitutionality are difficult to pin down. First, they refer to disparity in size between the districts and have attempted in their own hypothetical districts to equalize almost exactly the population in each. They disclaim exact equality as a basis of unconstitutionality probably because of the history of 2 U.S.C. § 2a and because of Wood v. Broom, 287 U.S. 1, 53 S.Ct. 1, 77 L.Ed. 131 (1932).

Although plaintiffs obliquely disavow the racial percentage theory, their statistical argument supports it. They show that of Manhattan's 1,698,281 inhabitants the 1960 census lists 1,058,589 or 62.3% as white (apparently all races and places of origin) and 639,692 or 37.7% as "non-white and Puerto Rican origin". Why the census so discriminates, plaintiffs were unable to answer except as their witness said that the census limits races to non-whites and place of origin to Puerto Rico. Plaintiffs then show that of the four districts the percentages of non-whites and Puerto Rican are 3.1%, 58.2%, 19.8% and 18.9% in the 17th, 18th, 19th and 20th Districts, respectively. From these figures plaintiffs ask this court to conclude as a matter of law that the Legislature in 1961 drew the district lines so as to intentionally deprive non-whites and Puerto Ricans of their constitutional rights. "Constitutional rights" to do what still remains unanswered. Plaintiffs apparently want a higher percentage of non-whites and Puerto Ricans in the 17th. Their neighbors, the intervenors, proclaim with equal vehemence that such a change would be violative of their rights to enjoy the redistricting as it now is. They claim, in effect, that to take a substantial number of non-whites and Puerto Ricans and to place them within the confines of a different Congressional district (namely, the 17th) would be an Acadia-like deportation designed to dissipate and thus make ineffectual their votes. They assert that they now have an opportunity to elect persons of their own race to represent them and their interests to legislative bodies. Plaintiffs respond that this is of no importance.

Finally and before considering the legal problems, if there be any, a brief review of New York County's congressional districts should be made. A 50-year period has been selected. In 1911 there were 9 full districts and parts of 4 other districts in New York County out of a total of 43 in the State. In 1917 the 1911 apportionment was amended changing the County to 10 full districts and parts of 3 others. Based on the 1910 census, the variation in the Congressional Districts Nos. 11–22 was slight, ranging from 204,498 to 219,772. After the 1920 census applying the 1922 Act, the variation was larger, probably

tions with party contests. From the determination of such issues this Court has traditionally held aloof. It is hostile to a democratic system to involve the judiciary in the politics of the people. And it is not less pernicious if such judicial intervention in an essentially political contest be dressed up in the abstract phrases of the law. * * *

"To sustain this action would cut very deep into the very being of Congress. Courts ought not to enter this political thicket."

due to population shifts, the low (from available figures) being 191,645 and the high 317,803. Wider disparity developed after the 1930 census, the low being 90,-671 and the high 381,212. After the 1940 census and the State was allotted 45 districts, New York County was given 6 full districts and part of one other, the population range being from 257,879 to 315,639. Not until after the 1950 census was New York County allotted self-contained districts, it receiving 6 out of 43 for the State, the smallest district having a census population of 316,-434 and the largest 336,441.

This suit is but one of many throughout the country seeking to take advantage of the Supreme Court's decision in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).[4] To inject a racial angle plaintiffs have added Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), and the school segregation cases to support their thesis. However, the most drastic Procrustean treatment will not conform the shape of the present case to the patterns of those cases. Baker v. Carr was simply a decision that a federal court has jurisdiction to deal with and remedy such a wide disparity in voting representation as to

amount to a deprivation of due process and equal protection. There the situation was particularly aggravated because the Tennessee Legislature had taken no action to comply with the state's own Constitution. A comparable hypothetical state of facts would exist had the New York Legislature taken no action since 1901 when New York County held a high percentage of the State's 37 seats whereas today the County's population is only one-tenth of the State's. But this factual situation of non-action does not exist. The Legislature has taken revising action after each census and at present the ratio of voter to Representative is, as the Legislative Committee has said, on a "substantial equality of population" basis.

The Gomillion case has no application whatsoever. There some 400 Negro residents of the city of Tuskegee who were entitled to all the privileges of city residents including voting were deliberately disenfranchised from such voting by a wholly irrational drawing of new city boundaries which did not even slightly veil the obvious purpose of excluding Negroes as city voters.

The school cases are equally irrelevant. If it is to be found as a fact that only in

4. Of the cases upon the subject of apportionment which have come to my attention, four have held the existing state apportionment provisions constitutional: W. M. C. A., Inc. v. Simon, S.D.N.Y., 1962, 208 F.Supp. 368 (Statutory Court); Wisconsin v. Zimmerman, W.D.Wisc., 1962, 209 F.Supp. 183 (Statutory Court) (report of Special Master); Caesar v. Williams, (1962), Idaho, 371 P.2d 241; Maryland Comm. for Fair Representation v. Tawes, (Md.1962), 184 A.2d 715 (upper house).

Others have found the apportionment statutes in conflict with the state constitution: Sims v. Frink, 205 F.Supp. 245 (M.D.Ala. April 14, 1962) (Statutory Court); Harris v. Shanahan, No. 90,476, Dist. Ct. Shawnee County, Kan., May 31, 1962; State ex rel. Lein v. Sathre, 113 N.W.2d 679 (N.D.1962); Lein v. Sathre, 205 F.Supp. 536 (D.N.D. May 31, 1962) (Statutory Court); Mikell v. Rousseau, Vt., 1962, 183 A.2d 817.

See also Start v. Lawrence, Equity No. 2536, 1962 Commonwealth No. 187, C. P.

Dauphin County, Pa., June 13, 1962 (court refused to determine whether the apportionment statutes comported with the state and federal constitutions until the legislature had time to act).

Still others have held the apportionment provisions invalid under the equal protection clause of the Fourteenth Amendment: Sanders v. Gray, 203 F.Supp. 158 (N.D.Ga. April 28, 1962) (Statutory Court); Toombs v. Fortson, 205 F.Supp. 248 (N.D.Ga. May 25, 1962) (Statutory Court); Moss v. Burkhart, W.D.Okla., 1962, 207 F.Supp. 885 (Statutory Court); Baker v. Carr, 206 F.Supp. 341 (M.D. Tenn. June 22, 1962) (Statutory Court); Maryland Comm. for Fair Representation v. Tawes, Equity No. 13920, Cir. Ct. Anne Arundel County, Md., May 24, 1962 (lower house); Scholle v. Hare, Mich., 1962, 116 N.W.2d 350; Fortner v. Barnett, No. 59965, Ch. Hinds County, Miss., 1962; Sweeney v. Note, R.I., 1962, 183 A.2d 296.

the 17th District is there and will there be throughout the years a Congressman who alone can properly speak for the electorate of Manhattan as their representative further consideration might be given to these cases. However, both major political parties would vigorously dispute a finding that a lone Congressman from New York's 17th controls or vitally influences all actions by the Congress, no matter how able any such incumbent might be.

From various maps and figures plaintiffs ask this court to find constitutional deprivations. Actually plaintiffs have not even shown that their own voting status will be changed in any way. Prior to the reduction of New York County's Congressional seats to four, there were six districts, the 16th through 21st. In eliminating two, the Legislature apparently used the existing framework. It enlarged the 17th substantially on the north cutting into the old 18th and slightly on the south and it merged the balance of the old 18th with the 16th. The old 19th, 20th and 21st were made into two districts extending from the northerly part of Manhattan along the west side of the city around the southerly end of the island and up through the lower east side. Thus, the general district pattern was somewhat preserved despite the elimination of two districts.

No proof was tendered that the Legislature in drawing the district lines in previous years was motivated or influenced by any considerations which have become unconstitutional during subsequent years. Plaintiffs wholly failed to support their allegation of "repeated and energetic efforts" to seek legislative correction or that efforts were unavailing because of unconstitutional apportionment. Any challenge that correction if needed could not be made because of the composition of the State legislature is squarely met by the recent decision in WMCA Inc. et al. v. Simon et al., S.D.N. Y., 1962, 208 F.Supp. 368, wherein after a trial a three-Judge court found with respect to the apportionment of Senate and Assembly districts that the apportionment provisions of the State of New York are rational, not arbitrary, are of substantially historical origin, contain no geographical discrimination, permit an electoral majority to alter or change the same and are not unconstitutional under the relevant decisions of the United States Supreme Court. Certainly federal congressional redistricting would not affect New York legislative action and plaintiffs in this action have not attacked New York's method of creating its own Legislature. Nor has any proof been offered to indicate in any way that the Legislature in its various congressional boundary enactments from 1901 to date has redrawn district lines in conformity with non-white and Puerto Rican population shifts.

This case presents an example of an attempt to apply theories of completely unrelated situations (Baker v. Carr, Gomillion and the school cases). That the effort appears forced is not surprising. If the Legislature had created two Congressional districts in Manhattan each consisting of 100,000 persons, one almost wholly of Race A and the other of race B and assigning the balance of the County to two districts of 700,000 each, the question of discrimination might well be raised; but it did not so act.

No citizen of Manhattan, as a result of the legislative redistricting, has been deprived of his right to vote for the duly nominated candidates of the party of his choice and in the area in which he resides. Wherever areas have to be divided into districts, there will be voters who may prefer to vote in districts other than their own but such deprivation is not a constitutional deprivation. In any large city it is not unusual to find that persons of the same race or place of origin have a tendency to settle together in various areas. Often this understandable practice enables them to obtain representation in legislative bodies which otherwise would be denied to them. Where geographic boundaries include such concentrations there will be a higher percentage of one race in one district

than in others. To create districts based upon equal proportions of the various races inhabiting metropolitan areas would indeed be to indulge in practices verging upon the unconstitutional. Equally unconstitutional would appear to be plaintiffs' suggestion that only in Manhattan should there be an election at large of its four Congressional Representatives and that the district system be used elsewhere in the State. Any such legislation would definitely tend to abridge the voting status, if not the actual voting rights, of residents of Manhattan.

Plaintiffs having failed upon the facts and the law to establish any violation of their constitutional rights as a result of the action of the New York Legislature in enacting Chapter 980 of the Laws of 1961, the complaint must be dismissed. No costs.

FEINBERG, District Judge.

I concur in the result reached by Judge MOORE because I feel that plaintiffs have not met their burden of proving that the boundaries of the new 17th, 18th, 19th, and 20th Congressional Districts were drawn along racial lines, as they allege. I differ from the opinion of Judge Moore, however, in two major respects.

1. Judge Moore's opinion in several places implies that it is necessary for plaintiffs to show not only that the boundaries of the congressional districts were drawn on racial lines but also that there was some other dilution or diminution of the plaintiffs' right to vote. I disagree with this implication. If plaintiffs had proved that the district

lines were constituted on a racial basis, the fact that plaintiffs had an undiminished right to vote in such gerrymandered districts would be irrelevant. The constitutional vice would be use by the legislature of an impermissible standard, and the harm to plaintiffs that need be shown is only that such a standard was used. Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), and Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), provide support for the view that racially gerrymandered districts violate the Fifteenth Amendment, which provides that: "The right of citizens of the United States to vote shall not be denied or abridged * * * on account of race, color, or previous condition of servitude." In Baker, Mr. Justice Douglas referred to the Gomillion case as an instance "where a federal court enjoins gerrymandering based on racial lines," [1] and further stated that:

"Race, color, or previous condition of servitude is an impermissible standard by reason of the Fifteenth Amendment, and that alone is sufficient to explain Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L. Ed.2d 110." [2]

It is true that the emphasis in the Gomillion opinion is on the deprivation of a pre-existing right to a municipal vote. However, analysis of that case indicates that the Negroes of Tuskegee were free to establish their own separate municipality merely by filing a petition signed by 25 persons.[3] The view that racially drawn districts *per se* would also violate the Equal Protection Clause of the Fourteenth Amendment finds support in

1. 369 U.S. at 250 n. 5, 82 S.Ct. at 727, 7 L.Ed.2d 663.

2. 369 U.S. at 244, 82 S.Ct. at 724, 7 L. Ed.2d 663. But see the concurring opinion of Mr. Justice Whittaker in Gomillion where he stated that there was no violation of the Fifteenth Amendment by racial redistricting as long as the complaining voter enjoys the same right to vote as all others in the same district. Gomillion v. Lightfoot, 364 U.S. 339, 349, 81 S.Ct. 125, 131, 5 L.Ed.2d 110 (1960).

Under those circumstances, however, Mr. Justice Whittaker thought there would be a violation of the Equal Protection Clause of the Fourteenth Amendment. Ibid.

3. See Lucas, Dragon In The Thicket: A Perusal of Gomillion v. Lightfoot, Supreme Court Review 194, 210–11 (1961), where the author also suggests additional reasons for viewing the case as barring any segregation of voters even absent a technical loss of voting rights.

the *per curiam* decisions of the Supreme Court following Brown v. Board of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L. Ed. 873 (1954). These cases[4] outlawed racial segregation in public parks, beaches, buses, and golf courses without any discussion of harm resulting from discrimination in the use of those facilities. The issue can be posed by assuming a state statute which on its face indicated that all Negro voters would vote in one district and all white voters in another, with the number of persons in each district approximately equal. I have little doubt that such a statute would be held unconstitutional, but whether under the Fourteenth or Fifteenth Amendment, or both,[5] need not be decided now, in view of plaintiffs' failure to prove their case.

The intervenors contend that redistricting along the lines suggested by plaintiffs would, in effect, jeopardize the "control" by non-whites and Puerto Ricans of at least one congressional district. This—the loss of an alleged advantage to the class of voters plaintiffs claim to represent—is as irrelevant to the constitutional issue as the need to show some harm other than that inherent in the drawing of district lines on a racial basis. The argument assumes that under the Constitution there can be "good" segregation along racial lines as against "bad" segregation.[6] With respect to redistricting, the answer to this is found in Mr. Justice Harlan's famous phrase that the Constitution is color-blind.[7]

2. The case is a closer one for me than the opinion of Judge Moore would indicate it is for him. Plaintiffs did introduce evidence which might justify an inference that racial considerations motivated the 1961 reapportionment of congressional districts in Manhattan. However, other inferences, as set forth below, are equally or more justifiable. Plaintiffs have a difficult burden to meet in attacking the constitutionality of this state statute. See Baker v. Carr, supra, 369 S.Ct. at 266, 82 S.Ct. at 737, 7 L.Ed.2d 663 (Stewart, J., concurring); W.M.C.A., Inc. v. Simon, 208 F.Supp. 368, 373 (S.D.N.Y.1962). Upon analysis, I do not think that burden has been met.

In the 1961 redistricting, the legislature had to compress six New York County districts into four. This was done in what appears to be a logical fashion. Thus, in the 17th Congressional District, upon which plaintiffs have particularly focused, the legislature started with the outlines of the District as it was before and moved the lines in a rational manner. The area was expanded considerably on the east to the East River and to

4. New Orleans City Park Improvement Ass'n v. Detiege, 358 U.S. 54, 79 S.Ct. 99, 3 L.Ed.2d 46 (1958); Gayle v. Browder, 352 U.S. 903, 77 S.Ct. 145, 1 L. Ed.2d 114 (1956); Holmes v. Atlanta, 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 776 (1955); Mayor v. Dawson, 350 U.S. 877, 76 S.Ct. 133, 100 L.Ed. 774 (1955); Muir v. Louisville Park Theatrical Ass'n, 347 U.S. 971, 74 S.Ct. 783, 98 L.Ed. 1112 (1954). See Fay v. New York, 332 U.S. 261, 292–293, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947). See also Hernandez v. Texas, 347 U.S. 475, 478, 74 S.Ct. 667, 98 L.Ed. 866 (1954); Nixon v. Herndon, 273 U.S. 536, 541, 47 S.Ct. 446, 71 L.Ed. 759 (1927).

5. Plaintiffs here rely on both Amendments.

6. See Hughes v. Superior Court, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985 (1950) (picketing to compel the hiring of employees in proportion to the racial origin of employer's customers enjoined); cf. Progress Dev. Corp. v. Mitchell, 182 F. Supp. 681 (N.D.Ill.1960), rev'd in part, 286 F.2d 222 (7 Cir. 1961) (real estate developer's imposition of a "benevolent" quota); Bittker, The Case of the Checker-Board Ordinance: An Experiment in Race Relations, 71 Yale L.J. 1387 (1962), and authorities collected therein.

7. In his dissent in Plessy v. Ferguson, 163 U.S. 537, 559, 16 S.Ct. 1138, 1146, 41 L.Ed. 256 (1896), Mr. Justice Harlan stated: "There is no caste here. Our Constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law. The humblest is the peer of the most powerful. The law regards man as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved."

the north in even and contiguous fashion. This resulted in straighter and apparently more logical congressional lines than before, and most of the prior jigsaw appearance of the District lines on the eastern boundary was eliminated.[8] Thus, examination of the actual changes effected by the 1961 redistricting does not support plaintiffs' contention of racial discrimination. It is proper, of course, to focus primarily on these changes rather than the changes on the western boundaries of the 17th District legislated in 1941 and 1951. As to the 1941 changes, plaintiffs themselves concede in their post-trial memorandum that "a pattern of discriminatory fencing out of the 17th District really began to emerge only with the 1951 redistricting."[9] In any event, as to the western side of the 17th District generally (which the 1961 redistricting did not change), the record indicates that if the zigzags were now eliminated, the number of non-whites and Puerto Ricans brought into the District by this correction of the boundary lines would approximately equal the number of non-whites and Puerto Ricans excluded by the change.[10] I am not asserting that prior lines, once drawn, could not become discriminatory because the legislature, for racial reasons, deliberately failed to act over the years. However, in this case the proof adduced falls far short of establishing that contention. Therefore, the principal area of inquiry must be the changes brought about by the 1961 redistricting, and as to these, the district lines seem more rational than before.

One of plaintiffs' principal contentions is that if the 17th District were to be expanded in any direction so as to be made reasonably equal in population to the other congressional districts in New York County, any area to be added would substantially increase the percentage of non-whites and Puerto Ricans in the 17th District. Plaintiffs argue, therefore, that the 17th District's population was deliberately kept unreasonably low to avoid this result. However, although the population of the 17th District is appreciably smaller than its neighboring districts, it is still only about 27,000 below the average for the state, or less than 7 per cent, as Judge Moore points out. It is true that increasing the population of the 17th District to the average by moving the district lines up or down in contiguous fashion would probably result in a higher percentage of non-whites and Puerto Ricans in that District. However, a variation of only 7 per cent from the average does not, in my mind, justify a finding of racial discrimination.

The dissenting opinion notes that defendants and the intervenors might have proved that the district lines in question were drawn "as part of a political compromise between the major political parties" but that no proof of this was submitted. Although the intervenors raised as a defense the contention that the boundaries of the 17th District were formed "along partisan political lines rather than racial lines," there is no evidence in the record bearing on this issue.[11] Therefore, as I see it, none of the opinions in this case deal with the question of whether the drawing of district lines on a political basis would be constitutionally permissible.[12]

Apart from political considerations, then, the dissenting opinion concludes

8. The 17th District apparently had 49 lines prior to the 1961 redistricting and 31 subsequent to it.

9. Post-trial Brief for plaintiffs, p. 19.

10. Record, p. 134.

11. After the close of hearings, the Court requested the parties, by stipulation, to furnish additional information as to population, voting and enrollment figures for certain designated areas. However, plaintiffs objected to the relevance of this information and to the procedure by which it was being obtained. Therefore, the Court is not considering as part of the record before it the information which was furnished by defendants.

12. In a supplemental brief, plaintiffs contend that it would not be. See Bickel, The Durability of Colegrove v. Green, 72 Yale L.J. 39, 43 (1962).

that "the only available inference" from the figures on percentages of non-whites and Puerto Ricans relied upon by plaintiffs is one of legislative intent to draw district lines on the basis of race and national origin. I do not agree that this is the only available inference. On the record in this case, the figures give rise to another inference equally, or more, persuasive. That inference is that since the non-whites and Puerto Ricans in Manhattan live in certain concentrated areas (see plaintiffs' Exhibit 4), many combinations of possible congressional district lines, no matter how innocently or rationally drawn, would also result in comparable figures. This is made clear, for example, by one of plaintiffs' three suggested alternative methods of drawing congressional district lines in Manhattan. Under plaintiffs' proposed Plan B, the percentage of non-whites and Puerto Ricans in one district would be 9.5 per cent, while in another district it would be 59.1 per cent. Even though these percentages differ greatly, would racial discrimination be "the only available inference" from these figures? Clearly, since plaintiffs have suggested the plan, such an inference would not be available at all, much less be the only available inference.

The dissent also properly asks, "What more need plaintiffs prove?" Some answers might be: a failure to build upon prior lines in a rational, logical manner, a greater population disparity, and an increase in boundary zigzagging. If plaintiffs had shown, for example, a failure to increase the population in the 17th District enough to keep it within a fair approximation of the statewide average, a stronger inference might be drawn that the population was deliberately kept small because adding to it could only increase the non-white percentage. In addition, if the increase had been achieved by aggravating the jigsaw nature of the boundaries or by drawing them in a serpentine manner,[13] a different case might be presented. It is true that there was some jigsawing at the top and the bottom of the new 17th District, but this was very slight. For example, Stuyvesant Town, which has a very small non-white and Puerto Rican population, was added to the District at the bottom, but the immediately adjacent area to the west, with an appreciably higher percentage of non-whites and Puerto Ricans, was not. The addition of Stuyvesant Town to the District, however, does not give rise only to the inference of racial discrimination. It also gives rise to the inference, equally persuasive, that the social and economic background of the residents of Stuyvesant Town made a unit which logically had a community of interest with the residents of the 17th District.[14] In short, based upon the entire record, I do not feel that plaintiffs have proved their case.

MURPHY, District Judge (dissenting).

The majority opinions both find that plaintiffs have failed in their proof, i. e., they have not proved a *prima facie* case of unconstitutional deprivation of their rights.

13. Cf. Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).

14. See Baker v. Carr, 369 U.S. 186, 323, 82 S.Ct. 691, 767, 7 L.Ed.2d 663 (1962) where Mr. Justice Frankfurter stated: "Apportionment, by its character, is a subject of extraordinary complexity, involving—even after the fundamental theoretical issues concerning what is to be represented in a representative legislature have been fought out or compromised —considerations of geography, demography, electoral convenience, economic and social cohesions or divergencies among particular local groups, communications, the practical effects of political institutions like the lobby and the city machine, ancient traditions and ties of settled usage, respect for proven incumbents of long experience and senior status, mathematical mechanics, censuses compiling relevant data, and a host of others."
While it is true that this language came from the dissenting opinion, it does not appear that the majority of the Court would disagree with this analysis of the apportionment process.

I disagree and find that plaintiffs have borne their *prima facie* burden (Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 475, 98 L.Ed. 866) and because of the absence of any proof by defendants or intervenors they are entitled to judgment declaring the challenged portion of Chapter 980 unconstitutional in violation of the equal protection clause of the fourteenth amendment. Let me premise my reasons with a few concessions.

I concede that there was a total absence of direct proof of any specific intent by the New York Legislature in drawing the lines of any district; I concede that disparity alone in the population of one district compared to another or to a general state or city average is not dispositive; I concede that of itself a district's lines whether jigsaw, straight, serpentine or otherwise would not be controlling; I concede that some disproportion of numbers of ethnic groups in adjoining districts would not be enough; I concede that the federal courts should ordinarily refrain from entering into "political thickets" and that it is beyond our competence to suggest or supervise a remedy for unlawful apportionment. But see Inequities in Districting for Congress: Baker v. Carr and Colegrove v. Green, 72 Yale L.J. 13 (1962.)

The uncontradicted proof submitted by plaintiffs, however, establishes a visual figure picture of the end results of the recent redistricting of Manhattan Isle (New York County) as follows:

Manhattan has a population of 1,698,281 people and is entitled to four congressmen. The census figures of 1960 divided the ethnic groups into only two classes—white and non-white and Puerto Rican. These classes have been counted and according to the census 1,058,589 or 62.3% are white and 639,622 or 37.7% are non-white and Puerto Rican.

The district lines as fixed by Chapter 980 created the four districts in question with the following make-up:

| District | Total Population | White Population | % of District | Non-White and Puerto Rican Origin Population of District | |
|---|---|---|---|---|---|
| 17th | 382,320 | 362,668 | 94.9% | 19,652 | 5.1% |
| 18th | 431,330 | 59,216 | 13.7% | 372,114 | 86.3% |
| 19th | 445,175 | 318,223 | 71.5% | 126,952 | 28.5% |
| 20th | 439,456 | 318,482 | 72.5% | 120,974 | 27.5% |
| Total | 1,698,281 | 1,058,589 | 62.3% | 639,692 | 37.7% |

The following table shows the percent of non-white persons and persons of Puerto Rican origin in each congressional district in relation to the total number of such persons in the entire county:

| District | % of Non-White and Puerto Rican of County |
|---|---|
| 17th | 3.1% |
| 18th | 58.2% |
| 19th | 19.8% |
| 20th | 18.9% |
| | 100.0% |

The figure picture of the 17th District shows that the lines as drawn encompass a population 94.9% white and 5.1% non-white and Puerto Rican. It further shows it has a population of 382,320 people, or between 15.4% and 12% less than any of the adjoining districts. The 18th District encompasses a population that is 86.3% non-white and Puerto Rican and only 13.7% white. Its population of 431,330 people is 12% more than the 17th and 5% above the state average.

It is my judgment that the only available inference from the above uncontradicted figure picture establishes *per se* a

*prima facie* case of a legislative intent to draw congressional district lines in the 17th and 18th Districts on the basis of race and national origin. To me it fits foursquare with Mr. Justice Frankfurter's statement in Gomillion v. Lightfoot, 364 U.S. 339, 341, 81 S.Ct. 125, 5 L.Ed.2d 110, that the act in question was not an ordinary geographical redistricting measure even within the familiar abuses of gerrymandering. Although Justice Frankfurter's statement referred to the court's holding that there was a violation of the fifteenth amendment this statement is equally apposite to the equal protection clause of the fourteenth amendment under Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873. Cf. the concurring opinion of Mr. Justice Whittaker in Gomillion at 349, 81 S.Ct. at 131, 5 L.Ed.2d 110. The conclusion here is, as in Gomillion, irresistible, tantamount for all practical purposes, to a mathematical demonstration that the legislation was solely concerned with segregating white, and colored and Puerto Rican voters by fencing colored and Puerto Rican citizens out of the 17th District and into a district of their own (the 18th).

We assume that had the district lines of the 17th District been drawn so as to exclude *all* non-white and Puerto Ricans, or the 18th to exclude *all* white, my brothers would agree that plaintiffs had established a *prima facie* case of *per se* segregation. Gomillion v. Lightfoot, supra. It is acknowledged, however, that plaintiffs' uncontradicted evidence demonstrates that New York County, an island having 639,692 non-white and Puerto Ricans or 37.7% of the total population, was redistricted into four congressional districts with one district, the 17th, having only 5.1% non-whites and Puerto Ricans and the 18th with only 13.7% white.

The question then posed is—Does the fact that the congressional district lines decreed by the state legislature for the 17th District to encompass only 5.1% non-white and Puerto Rican and the 18th only 13.7% white as distinguished from 0% so dilute plaintiffs' proof as to require them to prove more? If so, did they do it when the uncontradicted proof also showed that the 17th District had 15.4% less people than the adjoining 19th District; 14% less than the 20th and 12% less than the 18th. My brothers say "No" and I disagree.

It might very well be that the defendants and intervenors could have offered proof to counteract the inference of racial segregation that plaintiffs proof implies but they did not—and furthermore they chose not to do so. They might have proved all of the factors enumerated by Mr. Justice Frankfurter in Baker v. Carr, 369 U.S. 186, 323, 82 S.Ct. 691, 767, 7 L.Ed.2d 663, that go into the complicated political potpourri of apportionment. They might have proved that the lines were drawn as part of a political compromise between the major political parties to insulate certain sections for "traditional purposes"—but the simple answer is that they did not.

What more need plaintiffs prove? Surely it cannot be argued that they must prove some oral or written statement made by the legislature either in the form of a committee report or from the manager of the bill, or statements from the legislators themselves. It is undisputed that no public hearings were had on the bill and that the only report filed was the interim report of the Joint Legislative Committee on Reapportionment referred to by Judge MOORE. The bill recommended was submitted to the legislature on November 9, 1961, and passed on November 10, 1961, and was signed by the Governor that day. N.Y.Sess.Laws, 2d Extraordinary Sess. 1961, c. 980, §§ 110–112.

Judge FEINBERG and I part company only on the quantum of plaintiffs' proof. He agrees that the plaintiffs are not required to prove any diminution or dilution of their voting rights. They prove their *prima facie* case once they show that the district lines were constituted on racial basis but he agrees with Judge MOORE that the plaintiffs have not proved enough—but neither opinion

tells us how much more or enough of what.

Judge FEINBERG states that the principal area of the inquiry must be the changes brought about by the 1961 redistricting. With this as his premise he points out that the 17th District has approximately only 7% less population than the average for the state and such disproportion does not justify a finding of racial discrimination. I agree.

All I say is, it is a factor or a fact to be considered with all of the others, keeping in mind that the legislature was dividing an island into four districts and such island contained 37.7% nonwhite and Puerto Ricans.

He also suggests that the word picture of figures would infer not discrimination along racial lines but rather that nonwhite and Puerto Ricans live in certain concentrated areas so that district lines encompassing these areas would necessarily include a very high percentage of non-white and Puerto Ricans. This is exactly my point and also the plaintiffs. The pattern of the 18th District lines shows that they were drawn so that any district lines encompassing these areas would necessarily include a very high percentage of non-whites and Puerto Ricans. And, we might add, a very high percentage of whites in the 17th.

In answer to my question—What more need plaintiffs prove? He says some answers might be—not should be, but might be: (a) *Failure to build on prior lines in a rational, logical manner.* This presumes that the prior lines were without any constitutional infirmity. In any event, how does one build four districts on foundations of six districts? (b) *A greater population disparity.* It is suggested that if the plaintiffs had shown a failure to increase the population in the 17th District enough to keep it without a fair approximation of the state average a stronger inference might be drawn that the population was deliberately kept small because adding to it could only increase the non-white and Puerto Rican percentage. The 17th District is 7%

below the state average. Would 8% be enough, or 9%, or 10%, etc.? What is a fair approximation? Isn't it really a question of fact? How do you weigh such questions when a defendant offers no proof? I submit that the scale tips toward the plaintiffs. The City of New York with 7,781,984 people has been divided by the legislature into 19 districts with an average population per district of 409,578. It is true that the New York City average population almost equals the average population per district throughout the state. But why must we make comparisons with the entire 19 districts in the City of New York or the entire 41 districts in the state? We are dealing with Manhattan Island which for all practical purposes is a unique metropolitan area with many well-known river to river cross streets and famous north and south or longitudinal streets. See, for example, the plaintiffs other proof in which they demonstrated by three hypothetical divisions how the island could have been divided into four districts on a logical and rational basis using the natural boundaries or well-known streets and avenues. I agree that such hypothetical districts are not conclusive but they do have some probative value and I think are helpful in pointing up the obvious segregation that the legislature effected. (c) *An increase in boundary zigzagging.* How much of an increase and how is the number of zigzags measured or counted, and do you compare the zigzagging lines with the lines drawn by the legislature in 1951 or 1941, and do you confine yourself to Manhattan Island or New York City or any district in any part of the state.

I agree that no plaintiff, or for that matter any person on Manhattan Island, has lost or been deprived of a right to vote for Congress or that his vote will not be counted but the parallel to Gomillion (concurring opinion) is clear. There it was a glaring exclusion of Negroes from a municipal district. Here it is a subtle exclusion from a "silk stocking district" (as the 17th is so fre-

quently referred to) and a jamming in of colored and Puerto Ricans into the 18th or the kind of segregation that appeals to the intervenors.

We are told that the fifteenth amendment nullifies sophisticated as well as simple-minded discrimination. In my judgment the New York legislature has attempted, in violation of the equal protection clause of the fourteenth amendment, a sophisticated and subtle discrimination. Accordingly, I would give judgment for plaintiffs that the challenged part of the act is unconstitutional.