### Robert H. MOORE
#### v.
**John L. MOORE, as Judge of Probate of Mobile County, Alabama, Agnes Baggett, as Secretary of the State of Alabama, Roy Mayhall, as Chairman of the Democratic Executive Committee, Thomas H. Brigham, as Chairman of the Republican Executive Committee, and Richmond Flowers, as Attorney General of the State of Alabama.**

#### Civ. A. No. 3228-64.

United States District Court
S. D. Alabama, S. D.

Oct. 4, 1965.

David J. Vann, Vann & Patrick, Birmingham, Ala., for plaintiff.

Gordon Madison, Asst. Atty. Gen., Montgomery, Ala., for defendants John

L. Moore, Agnes Baggett, and Richmond Flowers.

David J. Vann, pro se, Vann & Patrick, Birmingham, Ala., for intervenor David J. Vann.

Roy Mayhall, Chairman, Democratic Executive Committee, Jasper, Ala., pro se.

Sam C. Pointer, Jr., Birmingham, Ala., for defendant Thomas H. Brigham.

Walter F. Eigenbrod, Eigenbrod & Terrell, Huntsville, Ala., for intervenor Eigenbrod, pro se.

Lawrence Dumas, Jr., Birmingham, Ala., intervenor, pro se, et al.

Before GEWIN, Circuit Judge, and THOMAS and JOHNSON, District Judges.

PER CURIAM.

The issue now presented to this Court is the validity of Senate Bill No. 208 adopted by the Legislature of the State of Alabama at the 1965 regular session and approved by the Governor on August 26, 1965, providing for eight Congressional Districts for the election of members of the U. S. House of Representatives, referred to as the "1965 Redistricting Act".[1] Validity of the Act must be determined by standards delineated in the United States Constitution, Article I, § 2, requiring that representatives shall be chosen "by the People of the several States" and shall be "apportioned among the several States * * according to their respective Numbers * * *.".

If the population of the State of Alabama were divided into the eight Congressional Districts to which the State is entitled, exactly according to numbers, the population of the average district would be 408,342. The parties involved in this litigation have agreed that the 1965 Redistricting Act divides the State of Alabama into eight Congressional Districts with populations, and variations from the average as shown by the following table:

| District | Population | Variations from Average | |
|---|---|---|---|
| District No. 1 | 414,392 | + 6,050 | + 1.5% |
| District No. 2 | 386,075 | —22,267 | — 5.5% |
| District No. 3 | 383,782 | —24,560 | — 6.0% |
| District No. 4 | 407,939 | — 403 | — .0% |
| District No. 5 | 435,745 | +27,403 | + 6.8% |
| District No. 6 | 438,130 | +29,788 | + 7.3% |
| District No. 7 | 417,052 | + 8,710 | + 2.1% |
| District No. 8 | 383,625 | —24,717 | — 6.0% |

The complaining parties contend that the 1965 Redistricting Act is invalid because there is too great a variation in the numbers of inhabitants among the various districts. It is obvious that the greatest variation occurs between District No. 6 which contains 7.3% more voters than the average, and Districts No. 3 and 8, each of which contain 6% less than the average. Thus the variation between the largest and the smallest districts is 13.3%. In addition, plaintiffs (including intervenors) complain of gerrymandering and contend that Jefferson County should not be partitioned among three Congressional Districts. In view of the fact that the population of Jefferson County is in excess of 600,000, it is ob-

[1]. Initially, this litigation involved the "9–8 Plan". See Moore v. Moore, 229 F.Supp. 435 (1964). Thereafter, on April 16, 1965, this Court held invalid Legislative Act No. 21 because of an unconstitutional imbalance in the number of inhabitants of the various Congressional Districts therein created. (Not reported.)

vious that it must be divided between at least two Congressional Districts in any event.

The leading pronouncement on the subject of Congressional Districting is the case of Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), wherein the Supreme Court established the following guiding principle:

"While it may not be possible to draw congressional districts with mathematical precision, that is no excuse for ignoring our Constitution's plain objective of making equal representation for equal numbers of people the fundamental goal for the House of Representatives. That is the high standard of justice and common sense which the Founders set for us."

■ After Wesberry, the Supreme Court considered the matter of apportionment of the Legislature of the State of Alabama. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). While different constitutional principles are involved in congressional districting from those applicable to apportioning representation in a state legislature, it was observed in Reynolds that Wesberry and Gray v. Sanders, 372 U.S. 368, 83 S. Ct. 801, 9 L.Ed.2d 821 (1963), are not "wholly inapposite" in dealing with the matter of the apportionment of seats in a state legislature. Likewise, in our judgment, the principles announced in Reynolds and the rationale of that decision are not wholly inapposite to this case. Certainly in both situations the objective should be equal representation for equal numbers of people. Fundamental to the constitutional inquiry is whether the state in question has been "apportioned sufficiently on a population basis to be sustainable." However, "mathematical nicety is not a constitutional requisite." See Reynolds v. Sims, supra, 377 U.S. at 569, 84 S.Ct. at 1385.

■ The matter of apportioning representation in state legislative bodies and the establishment of congressional districts for the election of members of the U. S. House of Representatives is primarily the duty of the state legislature and courts have long shown judicial restraint with respect to entering what some have described as "political thickets and mathematical quagmires." Indeed, federal courts have entered the field only when there has been a clear denial of constitutional rights which required judicial protection. For example, in Reynolds the Court constantly referred to the serious disparities there involved where the votes of 2, 5, or 10 persons in one area were required to equal the single vote of a person residing in a favored area. In speaking of the problem as it related to representation in the state legislature, The Court succinctly and clearly declared the rule as follows:

"Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a *substantial fashion* diluted when compared with votes of citizens living in other parts of the State." (Emphasis added)

With respect to an appropriate remedy, the practical impossibility of mathematical exactness or precision was recognized:

"By holding that as a federal constitutional requisite both houses of a state legislature must be apportioned on a population basis, we mean that the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable. We realize that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters. *Mathematical exactness or precision is hardly a workable constitutional requirement.*" (Emphasis added)

And in footnote 27, the Court chose the following quotation from the opinion in Bain Peanut Co. v. Pinson, 282 U.S. 499, 501, 51 S.Ct. 228, 229, 75 L.Ed. 482, 491: "We must remember that the machinery of government would not work if it were not allowed a little play in its joints."

■ Legislation establishing congressional districts must be "based substantially on population and the equal-population principle." However, this principle is not to be applied without considering the necessity of flexibility in determining how widely the number of inhabitants of districts may vary or the degree to which deviation from a strict population standard may be permitted. As indicated, federal courts have constantly sought to avoid usurpation of the primary responsibility of the state legislature to establish fair and appropriate congressional districts and to permit a good faith effort on the part of such state legislatures to comply with federal constitutional principles. In Reynolds, the Court appraised its holding in Wesberry as follows:

"We determined [in Wesberry] that the constitutional test for the validity of congressional districting schemes was one of *substantial equality* of population among the various districts established by a state legislature for the election of members of the Federal House of Representatives." (Emphasis added.)

Although constitutional rights and principles cannot be ignored or made subordinate to political expediency, courts recognize the fact that legislative bodies in a democracy do not, and cannot perform and function according to a slide rule, or with mathematical precision and certainty. Democracy does not operate in that fashion. There remains the necessity of giving consideration to all legitimate contentions, interests and other appropriate factors involved in the legislative process. Indeed, the courts themselves have not functioned in an exact and precise manner in dealing with the subject. Practical and equitable considerations are also important. Concrete and specific standards for evaluating con-

gressional districting plans and schemes are yet to be developed on a case-by-case basis, with substantial equality of population being the primary goal. While from a political standpoint the action of the Alabama Legislature by the 1965 Redistricting Act (Senate Bill 208) in dividing Jefferson County among three congressional districts might not be acceptable to all of the inhabitants of Jefferson County as a political unit, and while had this Court found it necessary to declare the 1965 Redistricting Act (Senate Bill 208) unconstitutional and devise its own redistricting plan, it possibly would not have found it necessary to divide the political unit of Jefferson County into three congressional districts, these are not the Constitutional standards controlling the action of this Court.

■ Judged by the constitutional standards herein discussed, we conclude that the Legislature of the State of Alabama has made a good faith effort which has resulted in the establishment of constitutional congressional districts based on substantial equality of population in accordance with the requirements of Wesberry v. Sanders. We hold the 1965 Redistricting Act to be valid.

There are opinions from substantial sources to the effect that the population of each congressional district should be within a range of 10 to 15 per cent of the average district population. See Wesberry v. Vandiver (N.D.Ga.1962) 206 F. Supp. 276, reversed on appeal sub nom. Wesberry v. Sanders, 1964, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481.[2] See also House Report No. 140, 89th Congress, 1st Session, recommending favorable action on H.R. 5505 relating to the establishment of congressional districts and providing that the population of no district shall deviate by more than 15 per cent from the result obtained by dividing the population of the state by the number of representatives to which the state is en-

2. The District Court of Georgia denied relief and dismissed the complaint. In the District Court the plaintiffs relied upon the view of the American Political Science Association that the variation should be within the range of 10 to 15 per cent of the average district population. See Wesberry v. Vandiver, 206 F. Supp. at 279.

titled. H.R. 5505 was passed by the House of Representatives and is now pending in the Senate. See Toombs v. Fortson (N.D.Ga.1965) 241 F.Supp. 65, 70.

It is further contended that citizens of Jefferson County have been "gerrymandered as ineffective minorities which can be expected to be controlled by voters residing outside of Jefferson County." The Sixth Congressional District is composed exclusively of inhabitants of Jefferson County. There are approximately 135,000 inhabitants of Jefferson County located in the Fifth District who constitute approximately one-third of the total population of that district, and approximately 61,000 such residents are located in the Fourth District who constitute approximately 15% of the total population of that District. Tested by the principles laid down in Wright v. Rockefeller (S.D. N.Y.1962) 211 F.Supp. 460, aff'd., Wright v. Rockefeller, 376 U.S. 52, 11 L.Ed.2d 512, 84 S.Ct. 603, we are unable to agree with the plaintiffs.

We have given full and careful consideration to all of the contentions of the plaintiffs, but it does not seem inappropriate to mention the long established rule that legislative acts should not be declared unconstitutional except for clear and cogent reasons. Early in the judicial history of this country, Mr. Chief Justice Marshall stated the rule to be:

> "On more than one occasion, this Court as expressed the cautious circumspection with which it approaches the consideration of such questions; and has declared, that, in no doubtful case, would it pronounce a legislative act to be contrary to the Constitution."

Dartmouth College v. Woodward, 4 Wheat. 518, 625, 4 L.Ed. 629, 656 (1819). See also Fairbank v. United States, 181 U.S. 283, 21 S.Ct. 648, 45 L.Ed. 862 (1901); Walton v. House of Representatives, 265 U.S. 487, 44 S.Ct. 628, 68 L. Ed. 1115 (1925); United States v. Carolene Products Company, 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938); Snow-

den v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1943); Willoughby, The Constitutional Law of the U. S. (2nd ed.) V.I, § 27, p. 46.

Having concluded that the plaintiffs have failed to establish any violation of their constitutional rights as a result of the enactment of the 1965 Redistricting Act under the facts proved and under the the established law, further relief sought by plaintiffs and the intervenors must be denied.